**ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY**

v.

**The UNITED STATES.**

Nos. 289-65, 303-66.

United States Court of Claims.
Dec. 12, 1972.

Robert E. Simpson, Washington, D. C., for plaintiff. Robert T. Molloy, Washington, D. C., attorney of record. George E. Bailey, St. Louis, Mo., of counsel.

Frances Foltz Kane, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Fred B. Ugast, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

COWEN, Chief Judge, delivered the opinion of the court:

In our decision of July 14, 1971 (herein referred to as *St. Louis No. 1*), in these related tax cases, we decided several issues relating to the measurement of debt discount claimed as the result of the exchange of new debt obligations for outstanding debt obligations and out-

standing stock. St. Louis-San Francisco Ry. v. United States, 444 F.2d 1102, 195 Ct.Cl. 343 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665 (1972). The parties' pending cross-motions for summary judgment require us to decide two additional issues that were not raised in the earlier decision and one which both parties now agree is governed by *St. Louis No. 1*.

## I

### The Reduction of Basis

In *St. Louis No. 1*, we held that because plaintiff had failed to raise the reduction-in-basis issue (as it relates to depreciable property) in its claim for refund, it could not assert the claim on motion for summary judgment. However, this holding did not foreclose plaintiff from asserting the claim as an offset to offsets claimed by defendant. Plaintiff was allowed to file an amended reply to defendant's first amended answer, and plaintiff's current motion is based on this newly pleaded issue.

In 1959, 1960, and 1962, plaintiff reacquired a portion of the debentures that it had issued in 1956 in exchange for outstanding preferred stock. Upon audit, the IRS determined that the reacquisition resulted in a gain, but plaintiff elected to have the gain excluded from its income pursuant to Section 108(a) of the Internal Revenue Code of 1954.[1]

Plaintiff executed Treasury Consent Form 982, which is a prelude to the reduction in the tax basis of certain property to the extent of the unrecognized gain. Section 1017 of the Internal Revenue Code of 1954 is the statutory authority for this reduction.

Plaintiff desired to have the basis of the preferred stock reduced but was rebuffed by the Commissioner. In *St. Louis No. 1* we held that the Commissioner's ruling was correct, because the preferred stock was no longer in existence for the years 1959, 1960, and 1962. The Commissioner did allow a reduction in basis of plaintiff's depreciable property but restricted the reduction to ratably depreciable property. By "ratably depreciable property", we understand that defendant means the kind of property in which the cost or other basis is ratably spread over its estimated useful life during which annual deductions for depreciation are made in accordance with some accounting method such as the straight-line method. In addition to its ratably depreciable property, plaintiff also owns non-ratably depreciable property, *e. g.*, track and rails. Plaintiff depreciates these items by the use of retirement-replacement-betterment method of depreciation (herein referred to as RR&B method). Recently, we had occasion to review the definition and application of the RR&B method in Chicago, Burlington & Quincy R. R. v.

1. § 108. Income from discharge of indebtedness

   (a) *Special Rule of Exclusion.*—No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if—

   (1) the indebtedness was incurred or assumed—

   (A) by a corporation, or

   (B) by an individual in connection with property used in his trade or business, and

   (2) such taxpayer makes and files a consent to the regulations prescribed under section 1017 (relating to adjustment of basis) then in effect at such time and in

such manner as the Secretary or his delegate by regulations prescribes.

In such case, the amount of any income of such taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income, and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. [We note that § 108(b) does not apply since this was not a discharge, cancellation, or modification affected by an order of a court in a receivership proceeding.]

United States, 455 F.2d 993, 197 Ct.Cl. 264 (1972), cert. granted, 409 U.S. 947, 93 S.Ct. 291, 34 L.Ed.2d 217 (1972). Consequently, we will not repeat that discussion except to the extent necessary to the decision in this case.

The basis adjustment regulation upon which taxpayer asserts its offset was promulgated at the behest of Congress when the predecessor to section 1017 was made a permanent provision in 1951.[2] It would be difficult to imagine a broader delegation of the legislative prerogative than the authority granted to the Secretary in this instance:

§ 1017. *Discharge of indebtedness*

Where any amount is excluded from gross income under section 108(a) (relating to income from discharge of indebtedness) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of *any* property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. *The amount to be so applied* (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 108(a)) *and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Secretary or his delegate) in effect at the time of the filing of the consent by the taxpayer referred to in section 108(a)* * * *. [Emphasis added.]

The anticipated amendment to the regulation was promulgated on April 2, 1953,[3] and is represented in applicable part by the current regulation § 1.1017–1(b)(7):

Any reduction in basis which remains to be taken (by reason of an exclusion from gross income under section 108(a)) after the application of paragraph (a)(1) of this section *shall be applied first against property of a character subject to the allowance for depreciation under section 167* * * *. [Emphasis added.]

■ There is no doubt that the RR&B method of accounting is an acceptable method for depreciating property under section 167 of the Code, and defendant conceded that fact in oral argument. Approval of this method of accounting by the Internal Revenue Service has been an established fact at least since 1940 when the Seventh Circuit decided Chicago & North Western Ry. v. Commissioner.[4] Boston & Maine R. R. v. Commissioner[5] case, decided three and one-half months after the above-quoted regulation was promulgated, again approved this method as an acceptable method under the provisions of the predecessor to section 167. Additionally, in Revenue Ruling 67–22, the Commissioner stated that "both the railroad industry and the Internal Revenue Service use 'retirement method' to mean a method of accounting for depreciation."[6]

That would seem to end the matter. Since it is undisputed that the taxpayer's RR&B property is of the "character subject to the allowance for depreciation under section 167," the basis of such property is qualified for reduction under section 1017.

However, defendant would have us re-write its regulation to differentiate between ratably and non-ratably depreci-

---

2. Revenue Act of 1951, ch. 521, § 304, 65 Stat. 452.

3. T.D. 6003 (1953 Cum.Bull. 24) (Treas. Regs. 111 (1939 Code), § 29.113(b)(3)–1 (G)).

4. 114 F.2d 882 (7th Cir. 1940, cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128

(1941). In this decision, it was the Government that relied on the method as the proper method of depreciation.

5. 206 F.2d 617 (1st Cir. 1953).

6. 1967–1 Cum.Bull. 52.

able property, both of which are of a "character subject to the allowance for depreciation under section 167." The Government contends that while the RR&B method is an appropriate method for use under section 167 in other circumstances, the allowance of plaintiff's claimed reduction in the basis of RR&B property would be contrary to the intent of Congress as revealed in the Senate Report accompanying the Revenue Act of 1951. The Senate Report [7] states in pertinent part:

> The Secretary of the Treasury has authority under section 113(b)(3) [section 1017 of the 1954 Code] to prescribe regulations which will set forth rules under which the adjustment to basis shall be made * * *. In order to assure that the exclusion of income by operation of section 22(b)(9) [section 108(a) of the 1954 Code] may result only in a temporary postponement of the tax liability, your committee understands that the Secretary of the Treasury will require by regulations that, after adjustment of the basis of certain property acquired with the purchase money indebtedness, whatever reduction in basis of property remains to be taken under section 113(b)(3) will be taken, *in general,* against depreciable property or property subject to cost depletion and only as a last resort against nondepreciable property. Thus, in general, it is intended that a reduction in the basis of nondepreciable property will be made only after the exhaustion of depreciable property or property subject to cost depletion. This provision will assure the collection within a reasonable time of the taxes postponed and will, therefore, have no appreciable long-run effect on the revenue. [Emphasis added.]

After a careful reading of the Senate Report, we cannot agree with defendant's contention that Congress clearly intended that the proposed regulation would apply only to ratably depreciable property. Furthermore, we find no support for defendant's argument that the RR&B method was not considered a method of depreciation at that time and was not comprehended by the regulation. It is true that the Senate Committee understood that the regulation would distinguish between depreciable and nondepreciable property and that Congress intended that a reduction in the basis of nondepreciable property would be made only after the exhaustion of depreciable property. The statement was also made that a regulation containing such a provision would assure the collection of the postponed taxes in a reasonable time and would have no appreciable long-run effect on the revenue. However, no reference whatever was made to non-ratably depreciable property, and there is no indication that the Senate Committee had its attention called to or considered in any way the interpretation of the regulation which defendant now urges upon us.

In contrast to the lack of any expression of the congressional intention with respect to the precise issue before us, we have the very broad delegation of legislative authority to the Secretary of the Treasury under the provisions of section 1017. The regulation in issue is a legislative regulation, which is the statute itself. It is to be differentiated from an interpretative regulation, which is one that rephrases the statute to give it body.[8] The adoption of defendant's interpretation would require a redrafting of the regulation, excluding any reference to section 167. We find nothing in the legislative history which authorizes or requires us to take that action.

In promulgating the regulation, the Internal Revenue Service adopted a shorthand method of dealing with a complex problem. It used a rational approach by the reference to section 167.

7. S.Rep. No. 781, 82d Cong., 1st Sess. 59–60 (1951–2 Cum.Bull. 458, 500).

8. *See* Griswold, A Summary of the Regulations Problem, 54 Harv.L.Rev. 398, 401 (1941).

An amendment of this legislative regulation to conform with defendant's arguments would require congressional hearings, or at least compliance with established Internal Revenue Service procedure for changes in the regulations and a careful weighing of the ramifications of proposed changes on various types of depreciable property.

The defendant argues that except where there is a complete abandonment or retirement of track without replacement, the tax lost as a result of the reduction in the basis of such property will not be recouped. The result, the defendant says, is to thwart the congressional purpose of avoiding an appreciable long-run effect on the revenue. It is true that only a small portion of railroad track or rails is retired every year, but more of this property is retired in some years than others. All of this is contemplated by section 167 for, as the court said in Boston & Maine R. R. v. Commissioner, *supra*:

> * * * [T]he underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. * * *[9]

Long range effects on the revenue are also brought about when there is a reduction in the basis of ratably depreciable property that has a useful life of more than 50 years. We believe that the Treasury had this in mind when it issued the regulation before us. We must also presume that the Treasury knew that RR&B property was of a "character subject to the allowance of depreciation under section 167." After all, the *Chicago & North Western* case had been decided 13 years earlier. *Boston & Maine,* decided a little over 3 months after the regulation was promulgated, was a signal that the regulation would have to be amended if it were to mean something other than what is clearly expressed by its terms. The fact that the regulation has remained unchanged for 19 years is, it seems to us, an indication of an administrative determination that when all the factors involved are considered, the use of the section 167 approach is the best means of carrying out the intent of Congress.

The use of the section 167 approach also gives a degree of certainty in an area where the need for certainty is high. As Professor Eustice points out:

> The dictates of practical administration of the tax laws demand a reasonable degree of certainty in their application, especially where a problem cuts across so many phases of business and personal activity as does the debt cancellation situation.[10]

In summary, we hold that the regulation, unamended by the interpretation which defendant advocates, conforms to the intent of Congress. If a line is to be drawn between ratably depreciable property and non-ratably depreciable property, as defendant argues, it would be equally logical and necessary to provide a distinction between short-lived ratably depreciable property and similar property having a very long estimated useful life. In view of the clear and unambiguous language of the regulation, the fact that it has remained unchanged for so many years, and the long history of approval of the RR&B method under section 167 and its predecessors, plaintiff had a right to rely on the regu-

---

9. 206 F.2d at 619.

10. Eustice, Cancellation of Indebtedness and the Federal Income Tax: a Problem of Creeping Confusion. 14 Tax.L.Rev. 225 (1959).

lation according to its terms. Since plaintiff's claim meets the requirements of section 1017, section 167, and the regulation, plaintiff is entitled to the offsets now claimed.

## II

*Unamortized Debt Discount Carryover*

■ In the 1947 reorganization, plaintiff's outstanding common and preferred stocks were eliminated as worthless. The outstanding debt was cancelled and the holders of the several classes of indebtedness received new bonds, preferred and common stock, and cash in satisfaction of their claims against plaintiff. After an audit of plaintiff's tax returns for 1947 and 1948, the Internal Revenue Service allowed the taxpayer to carry over unamortized discount and expense from its old bonds allocated to its new bonds, in the amount of $1,643,610.82. For the years in suit, the amortized deductions amounted to more than $23,000 per year.

As an offset, defendant now urges that the Service's action in allowing the carryover was erroneous. We agree. This issue is governed by our decision in Chicago, Milwaukee, St. Paul and Pacific R. R. v. United States, 404 F.2d 960, 186 Ct.Cl. 250 (1968). In that case, we held that issuance expense would be treated as would discount, and this being so, there could be no carryover of debt discount or issuance expense if the maturity value of the new bonds is less than the amount that was received when the old securities were issued.

■ We also held that when common or preferred stock is substituted for a debt, the principal of the debt is no longer to be paid at a fixed future date. Therefore, the discount and issuance expense attributable to the issuance of the old debt for which the stock is substituted is not deductible after the substitution is made.

It is established in this case that the net amount which plaintiff received upon the issuance of the old debt obliga-

tions that were cancelled in the 1947 reorganization was substantially greater than the total maturity value of the new bonds issued in exchange for the old obligations. In the 1947 reorganization, plaintiff also issued preferred and common stock having a par or stated total value of $120,763,545. Although the value of the stock is not to be computed in determining entitlement to the unamortized discount, computations based on the admission of the parties show that the addition of the value of the stock to the maturity value of the new bonds produces a total which is still considerably less than the amount received for the old bonds. The cash which plaintiff paid for interest due on the old debt in the 1947 reorganization is likewise not to be taken into account, because it was issued in a one-for-one exchange.

As its final argument on this issue, plaintiff urges that we should reconsider our decision in *Chicago, Milwaukee* because it is in possible conflict with Southwest Grease & Oil Co. v. United States, 308 F.Supp. 107 (D.C.1969), modified in part, 435 F.2d 675 (10th Cir. 1971). We think plaintiff misreads *Southwest*. In that case the taxpayer redeemed outstanding bonds at a premium, whereas here, plaintiff redeemed its old bonds at substantially less than the net amount received when the old bonds were issued. For each $1,000 bond, Southwest gave $1,290 in cash and new bonds. Therefore, deductions were allowed for both the premium and the issuance expense of the old bonds. This is totally different from the instant cases where taxpayer's new debt was substantially *less* than the old debt. The substantially lower new debt extinguished the discount, and as we said in *Chicago, Milwaukee*, "[t]here [was] nothing left to amortize."

Since the allowance of the carryover of the unamortized discount and expense was erroneous, plaintiff's recovery in these cases should be reduced by the amount of the erroneous allowances.

## III

### Original Issue Discount

In its motion for partial summary judgment in *St. Louis No. 1*, plaintiff claimed original issue discount for the years 1955, 1956, 1959, 1960 and 1961. In its reply to defendant's first amended answer in Docket No. 289–65, plaintiff alleged that it was entitled to original issue discount deductions for each of the years 1947 through 1955. Plaintiff now agrees that the issue with respect to the additional years mentioned was determined in defendant's favor by our decision in *St. Louis No. 1*. Therefore, defendant's motion for partial summary judgment on this question should be granted.

### Conclusion

Plaintiff's motion for summary judgment on Issue I is granted, and defendant's motion for partial summary judgment on Issues II and III is granted. The cases are remanded to the trial commissioner pursuant to Rule 131(c) for further proceedings consistent with this opinion.

DAVIS, Judge, dissenting in part:

I join with the court on "Unamortized Debt Discount Carryover" (Part II) and "Original Issue Discount" (Part III) but diverge on "The Reduction of Basis" (Part I). The latter question is very close. The court relies most heavily on the literal wording of the regulation which can easily be read without strain in the taxpayer's favor, as the court does. The counterforce, for me, is the overall purpose of Congress, in §§ 108 and 1017, not to put off indefinitely the taxation of gain from the reacquisition of corporate indebtedness.

The 1951 Senate Committee report (S.Rep.No.781, 82d Cong., 1st Sess. 59–60, 1951–52 Cum.Bull. 458, 500), quoted in the majority opinion, indicates that the "exclusion of income by operation of section 22(b)(9)" [now § 108(a)] should "result only in a temporary postponement of the tax liability", and that placing the exhaustion of nondepreciable property after the exhaustion of depreciable property (or property subject to cost depletion) "will assure the collection within a reasonable time of the taxes postponed and will, therefore, have no appreciable, long-run effect on the revenue." Under plaintiff's system of retirement accounting, that goal will not be at all achieved. The taxes postponed will not be collected in substantial measure unless the track and rails are wholly abandoned without replacement (an unlikely event as to any major segment of the road), or the railroad goes out of business (and in the latter case, as defendant points out, the company is unlikely to have any taxable income).[1] In other words, because the replacement of rails and tracks is expensed annually and the railroad does not use depreciation deductions as a means of gradually recouping the cost of those items, the basis-reduction sought by the taxpayer will not have the effect Congress envisaged of simply extending for a reasonable period the taxation of the gain on the reacquisition of the preferred stock, but will rather result in the indefinite postponement of most of the tax on that gain (with a good chance that it will never be taxed).

The court points out, in answer, that in the ratable system of depreciation many properties have a useful life of 50 years or more, hardly a temporary period. But the difference is that in those instances the reduction in basis, under the regulation, would lead at once to a pro rata reduction in the annual depre-

---

1. For its track and rails, the plaintiff does not reduce its income tax by depreciation deductions (which, of course, are intimately related to the basis of the property being depreciated) but by full deductions for replacements as if they are repairs (and for retirement if the property is permanently retired without replacement). The calculation of the replacement deductions has no necessary connection with the basis of the particular property; a reduction in basis under the regulation will therefore not reduce the allowable deductions.

ciation deductions, and thus to a gradual but continuous recovery of the postponed tax. Under plaintiff's view, there would be no such steady (though extended) payment of the tax.

In this light, the wording of the regulation does not seem to me to be decisive. Although we now consider the retirement-replacement-betterment system a general system of tax depreciation, that was not so clear in early 1953 when the regulation was promulgated. The broad language of Boston & Maine R. R. v. Commissioner, 206 F.2d 617 (C.A.1, 1953), was not yet on the books, and in the litigation of that case the Revenue Service obviously did not consider the retirement system a method of depreciation for all tax purposes. True, Chicago & North Western Ry. v. Commissioner, 114 F.2d 882, 885–886 (C.A.7, 1940), cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941), had accepted, over the railroad's protest, the Service's designation of the retirement system as a proper method of computing depreciation deductions under the predecessor of § 167, but that did not necessarily mean that rails and tracks were "property of a character subject to the allowance for depreciation" (the terms of the regulation now involved). There could be different characterizations for different purposes. The Service may have been thoughtless in letting this language remain unqualified after the *Boston & Maine* opinion, but that neglect does not override, in my opinion, the indications that neither the Congress nor the Treasury expected the regulation to be applied as plaintiff would have it.

Nor does it not seem to me stretching the words too far to exclude (because the purpose so requires) the plaintiff's replacement system for rails and track. The literal language is not that compelling or rigid. It is possible, in this setting, to read a "reduction in basis" to be applied "first against property of a character subject to the allowance for depreciation under section 167" as limited to property the basis of which is significant in the computation of the depre-

ciation deduction and, conversely, as designating replaced property as not "of a character subject to the allowance for depreciation."

In sum, I deem fulfillment of the legislative goal in this particular context as more important than adherence to the normal understanding, in other contexts, of the general language of the regulation, and believe that there is an acceptable reading of the regulation which advances rather than negates the Congressional aim.

NICHOLS, Judge, joins in the foregoing dissenting opinion.

