UNITED STATES of America, Appellee,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Missouri Railroad Corporation, Appellant.

No. 75–1734.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1976.

Decided June 25, 1976.

Robert T. Molloy, Vienna, Va., for appellant; Richard M. Johnson, Vienna, Va., and George E. Bailey, St. Louis, Mo., on brief.

George G. Wolf, Tax Div., Dept. of Justice, Washington, D.C., for appellee; Donald J. Stohr (former U.S. Atty.), Barry A. Short, U.S. Atty., effective May 15, 1976, Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews, Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D.C., on brief.

Before LAY, ROSS and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

The United States commenced this litigation to recover a refund of federal income taxes allegedly paid in error to the taxpayer, the St. Louis-San Francisco Railway Company (the Frisco), for the year 1965. The taxpayer counterclaimed for refunds of taxes paid in 1963, 1964 and 1965. The fundamental issue concerns the proper method of accounting for depreciation of the Frisco's railroad track under Int.Rev. Code of 1954, § 167.[1] Another issue is the tax treatment of certain debt securities and whether the taxpayer is collaterally estopped from litigating that issue. The trial court, the Honorable James H. Meredith presiding, held for the government on both the complaint and the counterclaim. We affirm the judgment of the district court.

I. *Accounting for Depreciation of Railroad Track.*

Under its Uniform System of Accounts for Railroad Companies, the Interstate Commerce Commission requires railroads to use a bookkeeping system called Retirement-Replacement-Betterment accounting (RRB) for their track structure. The Internal Revenue Service permits the railroads to use the same system to generate a depreciation allowance for the track.[2] The RRB system simplifies accounting for depreciation of the rails by treating the entire track as a single indivisible asset, so that calculation of ratable depreciation on each of the many individual rails is not required.[3] The track is carried on the books at the historical cost of the first rails laid, and that value is not reduced until a portion of the line is retired without replacement. All replacements, on the other hand, are expensed at cost less the value of the salvaged rails. RRB accounting assumes that, in the case of a mature railroad where replacements occur regularly, replacement cost will fairly approximate ratable depreciation.[4]

A somewhat more detailed discussion of the relevant transactions follows. When a railroad decides to replace a section of track, the capital account is not affected. Instead, the transaction is treated in the same manner as minor repairs are under other accounting systems, and the replacement is expensed at cost through the Retirement and Replacement Expense (RRE) account. A value is assigned to the used rail that is picked up and that value offsets the credit to the RRE account. Two

---

1. Int.Rev.Code of 1954, § 167 provides, in relevant part:
 (a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
 (1) of property used in the trade or business, or
 (2) of property held for the production of income.

2. Rev.Rul. 67–22, 1967–1 Cum.Bull. 52.

3. The RRB accounting system has previously been the subject of tax litigation and is ex-

plained in *Chicago, Burlington & Quincy R.R. v. United States,* 455 F.2d 993, 1005–07, 1010–14, 197 Ct.Cl. 264 (1972), *rev'd on other grounds,* 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973). See also *Missouri Pacific R.R. v. United States,* 497 F.2d 1386, 1399–1401 (Ct.Cl.1974); *Boston & Maine R.R. v. Commissioner of Internal Revenue,* 206 F.2d 617 (1st Cir. 1953).

4. Rails laid in the taxpayer's track have an average useful life of 60 years, and each rail is normally laid in four different places in the track before it is finally sold for scrap.

other relevant transaction types are (1) "additions," in which the line is extended, so that rail is laid where there was none before, and (2) "betterments," in which an existing rail is replaced with a better quality rail. The value of rails laid in an addition is capitalized in full. When a rail is laid in a betterment, its value is apportioned into two parts: that part representing the cost of a straight replacement is expensed while the part representing the cost of the improvement in quality is capitalized.

Thus, the capital account contains the original cost of the first rail laid in each location (additions) and subsequent betterments. The RRE account contains the value of all rails laid in replacement (including the replacement portion of betterments) reduced by the value assigned to rails picked up due to replacements and betterments in any one year.

In the present case, the Commissioner does not dispute use of the RRB accounting system. He contends only that the taxpayer is using that system incorrectly so that it does not clearly reflect income. Specifically, the Commissioner contends that the Frisco assigns too low a value to reusable rail picked up due to replacements, retirements and betterments. Since the value assigned to reusable rail reduces the RRE account balance, thereby decreasing the allowance for depreciation, use of too low a value will result in overstatement of depreciation expense.[5]

Under the taxpayer's system, when a new rail is laid in replacement, the credit to the RRE account is the cost, that is, current fair market value. Similarly, when a rail is sold for scrap, the debit to the RRE account is in the amount of the sale proceeds (the current fair market value). However,

when a reusable rail is picked up, it is valued at "average ledger value,"[6] (the average historical cost of the first rail laid in each location) and the debit to the RRE account is in that amount rather than fair marked value of reusable rail.

The Commissioner asserts that reusable rail, like new and scrap rail, must be valued at fair market value, which he determined to be the mean between the average cost per ton of new rail and scrap rail each year.[7] The Commissioner's position has been adopted by the Court of Claims, which held in a similar case that:

> [t]he symmetry of replacement accounting demands that if the high costs of replacement are to be charged to current expense, then salvage value assigned to reusable rail for relay as additions or betterments must correspondingly be based on current values. Otherwise, the allowable deduction for depreciation for the account as a whole is distorted, will in effect tend to constitute accelerated depreciation, and thus will not reflect a reasonable allowance for "exhaustion, wear and tear (including a reasonable allowance for obsolescence)," as required by § 167 of the Internal Revenue Code (1954).

*Chicago, Burlington & Quincy R.R. v. United States,* 455 F.2d 993, 1012, 197 Ct.Cl. 264 (1972), *rev'd on other grounds,* 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973).

The Frisco argues that use of current fair market value rather than average historical cost is impermissible under ICC regulations, and would result in taxation of unrealized gains due to inflation. The relevant ICC regulation provides:

> "Salvage value" means the amount received for property retired or from the

5. The valuation of reusable rail has tax consequences only when such rail is subsequently laid in additions or betterments. When a reusable rail is used to replace another reusable rail in a replacement in kind, the credit to RRE is the same as the offsetting debit to the RRE account for "salvage" of the rail picked up, resulting in a "wash".

6. Taxpayer's "average ledger value" was $35.72 per ton. That was *less than* the scrap value of rail for two of the three years in question. In contrast, the Commissioner determined the fair market value of reusable rail to be approximately $80.00 per ton for those years.

7. Rev.Rul. 67–145, 1967–1 Cum.Bull. 54; Rev. Proc. 68–46, 1968–2 Cum.Bull. 961.

salvage therefrom if sold; or, if retained, the amount at which the material recoverable is chargeable to material and supplies account or other appropriate account. *When such material is retained and again used by the carrier, the salvage value shall be determined by deducting a fair allowance from current prices of the material as new.*

Section 10.01–7(d), Uniform System of Accounts for Railroad Cos., 49 C.F.R. 1201(ii)18 (emphasis added).

The Frisco urges and an ICC witness confirmed that the ICC interprets the regulation to require valuation at historical cost less depreciation.

 The district court, however, held that "current prices of the material as new" means the cost of similar new rail less a reasonable allowance for actual wear and tear, that is, current fair market value. *Accord, Chicago, Burlington & Qunicy R.R. v. United States, supra* at 1012. We must agree. Any other interpretation of the ICC regulation makes the word "current" meaningless. In any event, the ICC regulation is not determinative if it results in a distortion of taxable income.[8] Here, the district court found, and we agree, that use of historical cost for reusable rail does not clearly reflect income under RRB accounting.

The Frisco's second contention, that the fair market value of reusable rail will always exceed historical cost in inflationary times, and that the effect of affirming the judgment below will be to tax the railroad for unrealized gains on inventory, is not well taken. First, analogies to inventory under other accounting systems are not particularly helpful in resolving problems under RRB accounting, where long-lived assets are expensed at the time of purchase rather than being capitalized. Second, any increase over historical cost will not be recognized as gain, it will merely reduce the allowance for depreciation. As the Court of Claims stated:

. . . under retirement-replacement-betterment accounting, . . . the value assigned to reusable rail is for the purpose of determining the extent to which the current charge to expense for replacements . . . should be reduced, so to reflect a reasonable allowance for depreciation. Thus, although the net effect of valuing reusable rail at current fair market value rather than historical cost may result in less after-tax income . . . it does so not by taxing unrealized appreciation but simply by reducing a depreciation deduction to a reasonable level.

*Chicago, Burlington & Quincy R.R. v. United States, supra* at 1012.

The Frisco also argues that the Commissioner's valuation of reusable rail is arbitrary and unreasonably high. The Commissioner's valuation is based on Rev.Proc. 68–46, 1968–2 Cum.Bull. 961, which provides that railroads may, for tax years prior to 1968, value reusable rail at the average of the market price of new rail and scrap rail for the particular taxable year. This method is not mandatory, and was adopted to aid railroads in making adjustments for prior tax years, due to the difficult problems of accurately valuing used rails.[9] These diffi-

---

8. Although we must give weight to the ICC's interpretation, it is well established that accounting rules promulgated by regulatory agencies for their own purposes cannot dictate the tax consequences if those rules do not clearly reflect income. *Commissioner of Internal Revenue v. Idaho Power Co.,* 418 U.S. 1, 15, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974); *Commissioner of Internal Revenue v. Lincoln Sav. & Loan Ass'n,* 403 U.S. 345, 359, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); *Kansas City Southern Ry. v. Commissioner of Internal Revenue,* 52 F.2d 372, 377–78 (8th Cir. 1931). As this court said in *Kansas City Southern:*

Systems of accounting for railroads under the control of the [ICC] cannot interfere with the government's system of taxation. The [ICC] has no power to direct how the Revenue Laws of the United States shall be interpreted or by its orders provide standards to govern the taxing authorities.

52 F.2d at 378.

9. The Revenue Procedure provides, in part:

The Internal Revenue Service recognizes that any adjustments to be made in accordance with Revenue Ruling 67–145, for taxable years that ended prior to May 8, 1967, present complex valuation and accounting

**316**

culties arise because there are virtually no open market sales of used rail, and because the rail cannot be appraised now, after 10 to 12 years of subsequent use, to determine what the actual expected life was in 1963, 1964 or 1965.

The fair market value of used rail must fall between the market price for similar new rail and scrap rail. The Commissioner's valuation assumes that the average reusable rail has 50 per cent of its useful life remaining. The Frisco, on the other hand, offered the testimony of its Chief Engineer who said that all but 30 to 40 per cent of the useful life, when measured in tonnage, supported at various speeds, is exhausted in the first location in which the average rail is laid.

■ The district court held that the Frisco, as the plaintiff on the counterclaim, had the burden of rebutting the Commissioner's valuation. *Riss v. Commissioner of Internal Revenue,* 478 F.2d 1160, 1164 (8th Cir. 1973). The district court found the Chief Engineer's testimony "unpersuasive," and held that the Commissioner's valuation was reasonable. *Accord, Chicago, Burlington & Quincy R.R. v. United States, supra* at 1012–13. We cannot say that the district court's finding is clearly erroneous. *See Zenith Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

II. *The Debt Discount Issues.*

The Frisco asserted a setoff for refunds for the years 1963, 1964 and 1965 on the basis of the Commissioner's disallowance of certain deductions for debt discount taken for those years. The district court found

that the railroad had litigated the same issues for different tax years in the Court of Claims in the cases of *St. Louis-San Francisco Ry. v. United States,* 470 F.2d 523, 200 Ct.Cl. 500 (1972), *cert. denied,* 417 U.S. 929, 94 S.Ct. 2639, 41 L.Ed.2d 232 (1974); and *St. Louis-San Francisco Ry. v. United States,* 444 F.2d 1102, 195 Ct.Cl. 343 (1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665 (1972). The district court held that the doctrine of collateral estoppel bars relitigation of any issue determined in a prior action between the same parties and that the doctrine is applicable in tax cases even though different taxable years are involved. *See Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Tait v. Western Md. Ry.,* 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 (1933). On that basis, the district court granted summary judgment for the government on the railroad's setoff.

The railway seeks relief from the bar of collateral estoppel on the ground that decisions subsequent to those in the Court of Claims have changed the controlling law in the area of debt discount. *See Commissioner of Internal Revenue v. Sunnen, supra.* The taxpayer primarily relies on *Commissioner of Internal Revenue v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974), and *Cities Service Co. v. United States,* 522 F.2d 1281 (2nd Cir. 1974), *cert. denied,* 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975). We find this reliance misplaced.

■ There is no need to recite the various transactions involved, as they are fully set forth in the Court of Claims cases. Nothing in *National Alfalfa* or *Cities Service* suggests that the holdings in the Court of Claims are erroneous.[10] Both *National*

---

problems. Appraisals are not practicable in the case of reusable railroad track materials because much of such track materials have been reinstalled in track and inspections of such materials in later years would not accurately disclose their fair market values as of the time they were recovered. Identification of previously recorded entries on the books and records, and adjustments thereto, would involve a very difficult and burdensome task.

To alleviate these problems, a simplified procedure for making necessary adjustments arising from the application of Revenue Ruling 67–145 is provided by this Revenue Procedure.

Rev.Proc. 68–46, 1968–2 Cum.Bull. 961.

10. The government points out:

[The Frisco's] petition for a writ of certiorari to the Court of Claims, to review its prior decisions on this issue, was held by the Su-

*Alfalfa* and *Cities Service* make it clear that when a corporation exchanges its own debt instruments for its older bonds or stock, debt discount can arise only if the net amount received by the corporation upon original issue of the old bonds or stock *was less than* the maturity value of the new bonds. The Court of Claims found that the net amount received by the Frisco upon issuance of the pre-1947 bonds so far exceeded the maturity value of the subsequent issues exchanged for the pre-1947 bonds that the unamortized discount could not be carried over and that no discount arose in the subsequent reorganizations. *St. Louis-San Francisco Ry. v. United States,* 470 F.2d 523, 529, 200 Ct.Cl. 500 (1972). The matter cannot now be relitigated by this taxpayer.

The judgment of the district court is affirmed.

preme Court while *National Alfalfa* was under consideration, and was denied within one week of its *National Alfalfa* decision. Appellee's brief at page 58.