The **BALTIMORE AND OHIO RAILROAD COMPANY**

v.

The **UNITED STATES.**

No. 412–73.

United States Court of Claims.

July 18, 1979.

James P. Holden, Washington, D. C., attorney of record, for plaintiff. Richard E. May, Washington, D. C. and John W. Tissue, of counsel.

Daniel Lavin, Tax Div., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

■ This income tax refund suit is one of a series of railroad taxation cases which have come before the courts involving the proper application of the retirement-replacement-betterment (RRB) accounting method to relay rail. After the conclusion of the trial in this case, the parties settled all the issues in the case except whether the adoption by plaintiff in 1955 of the valuation formula for relay rail set forth in *Chesapeake and Ohio Railway Co. v. Commissioner,* 64 T.C. 352, 392 (1975), constitutes an unauthorized change in accounting method by plaintiff. Although the issue of whether a change in valuation formula constitutes a change in tax accounting method was raised in at least two of the prior cases,[1] no court has yet ruled upon it. The issue is before this court on the parties' joint stipulation of facts and cross motions for summary judgment. After carefully considering the briefs and oral arguments presented, we hold for plaintiff.

---

10. *See* note 8 and accompanying text, *supra.*

1. See *Louisville and Nashville R.R. Co. v. Commissioner,* 66 T.C. 962, 998 (1976); *United States v. St. Louis-San Francisco Ry. Co.,* 35 AFTR 2d at 75–1323, 75–1 USTC at 86,988 (E.D.Mo.1975), *aff'd,* 537 F.2d 312 (8th Cir. 1976).

Plaintiff is a Class I rail carrier, regulated by the Interstate Commerce Commission (ICC). As such it is required by the ICC to use the RRB accounting method for its track structure, including rail. 49 C.F.R. § 1200 *et seq.* The Internal Revenue Service (IRS) also allows plaintiff to use the RRB accounting method to compute its depreciation deduction on its track structure, including rail, for income tax purposes. Rev.Rul. 67–22, 1967–1 C.B. 52.

Under the RRB accounting method a railroad computes its depreciation deduction for rails as follows. The initial investment required to place rail in service is capitalized and is generally referred to as an addition. No ratable deduction for depreciation is claimed and no depreciation reserve is maintained for the assets. When a particular section of rail is retired without replacement, its cost as reflected in the capital account, plus the costs of removal, less the salvage value of the removed rail, is deducted as a current expense. If existing rail is replaced in kind, however, the capital account is not disturbed. Instead, a current deduction consisting of the cost of the replacement rail, including the costs of laying the new rail, less the salvage value of the replaced rail, is taken. If existing rail is replaced with rail of a higher pattern weight, a betterment results and the cost attributable to the betterment is capitalized. The remainder of the cost of the replacement rail, including the costs of laying the new rail, less the salvage value of the replaced rail, is currently deducted.

The RRB accounting method is really merely a recognized alternative method of determining the annual cost incurred in using business property. *Louisville and Nashville Railroad Co. v. Commissioner,* 66 T.C. 962, 995 (1976). As pointed out by the court in *Boston and Maine Railroad v. Commissioner,* 206 F.2d 617 (1st Cir. 1953), the RRB accounting method gives railroads essentially the equivalent of ratable or annual depreciation deductions:

It is important to note immediately that the final charge to expense upon the retirement of a piece of equipment is not to be understood as an effort to make up for the failure to take any prior yearly "depreciation" on this particular item during its useful life. Rather the underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. At the same time it is thought that this method will eliminate the not inconsiderable bookkeeping problem of making annual depreciation adjustments on account of each and every asset owned by an extensive railroad. Thus, under both methods, the total charges to expense on account of any particular asset—to the extent that such a segregated concept makes any sense at all under the averaging approach of the retirement system— are the same; also, if the retirements occur fairly regularly, the total annual charge on account of equipment becoming unserviceable should eventually tend to become roughly equivalent under both methods. However, under the retirement system the total capital account (i. e., the book value of the assets) is always higher, since under that system no adjustments are made in this account until an item is actually retired. [*Id.* at 619.]

The salvage value of the replaced rail portion of the RRB accounting method is the root of the present litigation, as in prior cases. See *infra.* Rail which is completely worn out and no longer capable of safely accommodating further traffic (i. e., scrap rail) has a readily ascertainable remaining salvage value which is determined by the value of its metal content in the scrap metal market. Thus, scrap rail causes no valuation problems. Railroads, however, usual-

ly remove rail from main lines before it is completely worn out in order to satisfy various needs for rail on branch lines, yards, and sidings, where the use of new rail would not be economically warranted. This process is called cascading rail. In the cascading process new rail is first placed in main-line service, where it accumulates wear relatively rapidly. After it has received a planned level of wear, the rail is removed from the main line and relaid on branch lines, where it accumulates wear more slowly. Finally, the rail is removed from branch lines and relaid in yards and on sidings, where it accumulates wear very slowly. When recovered from these latter uses, the rail is usually completely worn out with only scrap value remaining. In railroad terminology, used rail which is picked up from one location for reuse by the railroad in a different location is generally referred to as relay rail, the type of rail involved herein.

Under the RRB accounting method, each time relay rail is removed from one location for reuse in another location the railroad is entitled to a current deduction for the replacement, retirement, or betterment made to its track structure. This requires the placing of a salvage value [2] upon the relay rail each time it is removed from a location for under the RRB accounting method the current deduction allowable upon the replacement of rail (whether in kind or with betterment), or the current deduction allowable upon the retirement of rail without replacement, must be reduced by the salvage value of the relay rail recovered. If the value of the relay rail is overstated, the net current deduction is thereby understated. Conversely, if the value of the relay rail is understated, the the net current deduction is thereby overstated.

Determining the salvage value of relay rail is an inexact task, however, for there is no established market upon which such rail is readily traded. Thus, valuation must be by estimation. Yet significant income tax ramifications result under the RRB accounting method when too high or too low a salvage value is assigned relay rail that is subsequently used by the railroad to make an addition or betterment to its track structure. Where rail is picked up and sold as scrap or is used as relay rail in a replacement in kind, it makes no difference as a practical matter what the salvage value is. The reason, as the Tax Court has succinctly pointed out, is:

 * * * [The railroad] reports as ordinary income any gain realized from the sale of scrap rail and, consequently, any adjustment in the salvage value assigned to scrap rail (which went to reduce the current expense) is offset by the corresponding change in the gain realized upon the sale of such scrap rail. Similarly, any salvage value assigned to relay rail on pickup (which reduced current expense) is the same value which would be charged to current expense when such rail is relaid. In both instances any adjustment in the assigned salvage value results in a "wash" item. However, when relay rail is subsequently relaid as an addition or a betterment, some or all of its basis is capitalized and, consequently, the offsetting effect is postponed for what may be a substantial period of time. [*Louisville and Nashville Railroad Co. v. Commissioner, supra,* at 994.]

The initial litigation over the proper valuation of relay rail under the RRB accounting method revolved around the IRS's Rev. Rul. 67–145, 1967–1 C.B. 54, wherein the IRS required railroads using the RRB accounting method to compute the depreciation of their track structures to value recovered track materials, including relay rail, at fair market value. Prior to the ruling

---

**2.** The term salvage value when used in relation to relay rail under the RRB accounting method has a different meaning than that term has under the annual depreciation method. Under the annual depreciation method, salvage value is the value of an asset that is no longer useful in the taxpayer's trade or business and there-fore is retired from service. Under the RRB accounting method, salvage value of relay rail is the value of the rail at the time it is picked up from one location for continued use in the taxpayer's trade or business. *Missouri Pacific R.R. Co. v. United States,* 497 F.2d 1386, 1399 fn. 18, 204 Ct.Cl. 837, 860 (1974).

some railroads had been valuing their relay rail by reference to its historical cost, rather than to the fair market value of rail at the time the relay rail was picked up. In the initial litigation the IRS succeeded in establishing the fair market value rule contained in Rev.Rul. 67–145, as applied to relay rail, and with retroactive effect. *Chicago, Burlington & Quincy Railroad Co. v. United States,* 455 F.2d 993, 1010, 197 Ct.Cl. 264, 292 (1972), *rev'd* on another issue, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973); *Missouri Pacific Railroad Co. v. United States,* 497 F.2d 1386, 1399, 204 Ct.Cl. 837 (1974); *Louisville and Nashville Railroad Co. v. Commissioner, supra,* at 993; *United States v. St. Louis-San Francisco Railway Co.,* 537 F.2d 312 (8th Cir. 1976).

After the promulgation of Rev.Rul. 67–145 the IRS, realizing the implementation of the ruling by railroads which had undervalued or overvalued their relay rail presented complex valuation and accounting issues, issued Rev.Proc. 68–46, 1968–2 C.B. 961. In Rev.Proc. 68–46 the IRS announced an acceptable valuation formula for determining the salvage value of relay rail at fair market value and a simplified procedure for making adjustments to the accounts of the railroads which revaluation pursuant to the valuation formula required.

Plaintiff herein does not contend that Rev.Rul. 67–145 is incorrect as the taxpayers did in the four previously cited relay rail cases. Nor are the parties in this suit in disagreement over whether the valuation formula announced in Rev.Proc. 68–46 or some other valuation formula should be used to establish the salvage value of plaintiff's relay rail during its 1955 taxable year. Compare *Chesapeake and Ohio Railway Co. v. Commissioner, supra,* at 384. They have

stipulated that the valuation formula set forth in *Chesapeake and Ohio* is the appropriate formula. That formula is as follows: [64 T.C. at 392]

$$V = .30(N - .9S) + .9S$$

where V = fair market value of relay rail
  N = price of rail new
  S = price of rail for scrap based on pattern weight

Application of the *Chesapeake and Ohio* valuation formula to plaintiff shows it overvalued the 10,715.758 tons of relay rail it relaid as additions and betterments to its track structure during 1955. The parties have stipulated that during 1955 the average price of new rail was $104.08 and the average price of scrap rail was $53.48. Utilizing the above formula, the value of plaintiff's relay rail used to make additions and betterments in 1955 would be $64.92 per ton. On its 1955 books and tax returns, however, plaintiff used the following valuation formula:[3]

$$V = .75N$$

where V = fair market value of relay rail
  N = price of rail new

Under the 75 percent of new rail price formula, plaintiff arrived at a value of $72.05 per ton.[4] Due to the resultant $7.13 per ton overvaluation of its relay rail, plaintiff's 1955 depreciation deduction, as computed under the RRB method of accounting, was decreased by a like amount per ton.[5]

Although defendant concedes by stipulation that the *Chesapeake and Ohio* valuation formula is the formula which most accurately reflects the fair market value of plaintiff's relay rail, that because plaintiff did not use this formula during 1955 it overvalued its relay rail, and that as a re-

3. Plaintiff consistently used the 75 percent of new rail price formula from 1918 through 1963.

4. The parties do not explain the discrepancy between the $72.05 valuation figure plaintiff used in its 1955 books and tax returns and $78.06, which is the figure plaintiff should have used if plaintiff had multiplied $104.08 by 75 percent. The parties attached no significance to this discrepancy.

5. Plaintiff's position is thus just the opposite of that of the taxpayers in *Chicago, Burlington & Quincy R.R. Co. v. United States, supra; Missouri Pacific R.R. Co. v. United States, supra; Louisville and Nashville R.R. Co. v. Commissioner, supra;* and *United States v. St. Louis-San Francisco Ry. Co., supra.* The taxpayers in those cases had undervalued their relay rail thereby obtaining a depreciation deduction under the RRB accounting method which was larger than legally allowable.

sult plaintiff's 1955 depreciation deduction for its track structure was smaller than the amount properly allowable under the RRB accounting method, defendant now contends that plaintiff cannot lawfully switch to the more accurate valuation formula for purposes of valuing its 1955 relay rail. Citing I.R.C. § 446(e) [6] and Treas.Reg. § 1.446–1(e)(2)(ii)(a),[7] T.D. 7073, 1970–1 C.B. 98, defendant argues that such a switch in valuation formulas is a change of accounting method which requires the prior approval of the Commissioner.[8] Such prior approval is required even if the accounting method being abandoned is an improper method of accounting. Treas.Reg. § 1.446–1(e)(2)(i), T.D. 7073, 1970–1 C.B. 98. Since plaintiff has not obtained such approval, defendant submits that plaintiff must continue to use the less accurate 75 percent of new rail price formula. Under the 75 percent formula, of course, plaintiff is entitled to no refund due to the relay rail issue.

We hold plaintiff's switch from the 75 percent valuation formula to the *Chesapeake and Ohio* valuation formula does not involve a change in accounting method. Therefore, plaintiff can switch to the *Chesapeake and Ohio* formula without obtaining the Commissioner's consent.

The sole problem the alternative valuation formulas are designed to deal with is the placing of a fair market value upon the relay rail in the absence of a market upon which such rail is readily traded and from which such a value could be ascertained. In other words, the valuation formulas are merely an estimation method of ascertaining the fact of value at the time the relay rail is picked up. Once that fact is determined, it is then plugged into the RRB accounting method, along with the other factors, to determine the railroad's allowable current expense deduction.

■ The factual nature of valuation is manifest. It is a fact in tax cases which the party having the burden of proof must prove to prevail. *See Chesapeake and Ohio Railway Co. v. Commissioner, supra,* at 392; *Louisville and Nashville Railroad Co. v. Commissioner, supra,* at 997. The regulations which define what is not a change in accounting method state that among other things "[a] change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts." Treas.Reg. § 1.446–1(e)(ii)(b), T.D. 7073, 1970–1 C.B. 98. We believe the value of the relay rail is such an underlying fact. And if subsequently the

---

**6.** I.R.C. § 446(e) reads:

"(e) *Requirement Respecting Change of Accounting Method.*—Except as otherwise expressly proved in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary."

**7.** Treas.Reg. § 1.446–1(e)(2)(ii)(a) reads:

"(ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. Changes in method of accounting include a change from the cash receipts and disbursement method to an accrual method, or vice versa, a change involving the

method or basis used in the valuation of inventories (see sections 471 and 472 and the regulations thereunder), a change from the cash or accrual method to a long-term contract method, or vice versa (see § 1.451–3), a change involving the adoption, use or discontinuance of any other specialized method of computing taxable income, such as the crop method, and a change where the Internal Revenue Code and regulations thereunder specifically require that the consent of the Commissioner must be obtained before adopting such a change."

**8.** The Government's position herein is thus just the opposite of its position in at least three of the prior cases wherein it contended that a change from one valuation formula (even a formula based upon historic cost) to another valuation formula did not constitute a change in accounting method. See cases cited in note 1 and Joint Stipulation 27. This change in position is no doubt due to the fact that the taxpayer's posture in those cases was just the opposite of the taxpayer's posture in this case. See note 5.

underlying fact of value, as originally determined, is shown to be wrong, a change to the correct factual value is merely a change in an underlying fact. *See also Cincinnati, New Orleans and Texas Pacific Railway Co. v. United States,* 424 F.2d 563, 191 Ct.Cl. 572 (1970).

In its reply brief defendant implicitly concedes that a mere switch between two methods of estimating the fair market value of relay rail does not involve a change in accounting method. In its reply, however, defendant refines its argument a step further to contending:

> * * * [In this case] we have not a shift between two fair market value estimation techniques, but *between an assigned value method* and a *fair market value estimation method.* [Defendant's Reply Brief at 5.] [Emphasis supplied.]

On the facts of this case we cannot agree with defendant's refined argument either. The fatal flaw in this argument of defendant is the failure to distinguish between valuation formulas designed to reflect the fair market value of relay rail at the time it is picked up and formulas which are partially or wholly based upon historic cost.[9] The 75 percent of new rail price formula used by plaintiff on its 1955 books and tax returns, like the valuation formulas in Rev. Proc. 68–46 and *Chesapeake and Ohio Railway Co.,* supra, is a formula designed to reflect fair market value.[10] The sole reference point of the formula is the price of new rail at the time the relay rail was picked up. The historic cost of rail played no role. New rail price is also one of two reference points used in both the Rev.Proc. 68–46 valuation formula and the *Chesapeake and Ohio* valuation formula. The second reference point of these latter formulas is the value of scrap rail. This refinement (the addition of a second reference point) does not alter the fact that in this case what plaintiff did is switch from one method of estimating fair market value (the 75 percent formula) to another like method (the *Chesapeake and Ohio* formula). Such a switch, as defendant implicitly conceded, is not a change in accounting method, but a mere change in the underlying facts brought about by the adoption of a more accurate valuation formula.[11]

Finally, we note that defendant's main contention in its main brief was that the switch in valuation formulas involved "a change in the treatment of a material item" within the meaning of Treas.Reg. § 1.446–1(e)(2)(ii)(a). Defendant presented this court with absolutely no data, statistical or otherwise, to substantiate this contention, however, it did not refute in its reply brief or at oral argument plaintiff's assertion that the effect of the change in valuation methods would cause a change of less than $2/10$ of 1 percent of plaintiff's net income, a figure which would seem to evince nonmateriality under this court's holding in *Cincinnati, New Orleans and Texas Pacific Railway Co. v. United States,* 424 F.2d at 571, 191 Ct.Cl. at 585. Nor did defendant argue the switch would cause a distortion in plaintiff's income or result in an accounting method which did not clearly reflect plaintiff's income.

---

**9.** For examples of valuation formulas based wholly or partially on the historic cost of the rail, see *Chicago, Burlington & Quincy R.R. Co. v. United States,* 455 F.2d at 1010, 197 Ct.Cl. at 292, and *United States v. St. Louis-San Francisco Ry. Co.,* supra, at 314. Such formulas are conceptually different in that they are not designed to reflect fair market value.

**10.** Comparison of the valuation figure derived for plaintiff's 1955 taxable year by using the 75 percent formula with the valuation figure derived, for the same year, under the formula contained in Rev.Proc. 68–46 further illustrates this point. The Rev.Proc. 68–46 formula is:

$$V = .5(N - S) + S$$

where V = fair market value of relay rail
N = price of rail new
S = price of rail for scrap based on pattern weight

The valuation under Rev.Proc. 68–46 is $78.78 per ton. The valuation under the 75 percent formula is $78.06. The difference is only 72 cents.

**11.** Had plaintiff switched from a valuation formula based wholly or partially on historic cost of rail to a formula based on factors designed to reflect fair market value, defendant's refined

Since we find there was no change in accounting method due to plaintiff's switching to the *Chesapeake and Ohio* valuation formula, we do not address plaintiff's alternative contention that the IRS consented to the change by promulgating Rev.Rul. 67–145 and Rev.Proc. 68–46.

## CONCLUSION

For the foregoing reasons, plaintiff's cross motion for summary judgment is granted, defendant's motion for summary judgment is denied, and the case is referred to the Trial Division for further proceedings pursuant to Rule 131(c).

argument would have applicability. If this were the case, we would be facing herein the same issue faced, but not decided, by the courts in the cases cited in note 1.