*Decision will be entered under Rule 155.*

RICHARDSON INVESTMENTS, INC., AND SUBSIDIARIES (FORMERLY KNOWN AS RICH FORD SALES, INC.), A NEW MEXICO CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3261–79.    Filed May 11, 1981.

*John S. Campbell* and *John D. Laflin,* for the petitioner.
*Douglas R. Fortney,* for the respondent.

STERRETT, *Judge*: By statutory notice dated December 15, 1978, respondent determined deficiencies in income tax as follows:

| Year ended Dec. 31— | Deficiency |
| --- | --- |
| 1971 | $109,701.31 |
| 1972 | 11,791.00 |
| 1974 | 20,900.50 |

The years 1971 and 1972 are in issue only because of petitioner's net operating loss carryback. The primary issue presented is whether petitioner, a retail automobile dealership engaged primarily in the purchase and retail sale of new and used cars and trucks, properly adopted the use of a single LIFO inventory pool in computing inventory values pursuant to the dollar-value, link-chain LIFO method under section 472, I.R.C. 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Richardson Investments, Inc. (formerly known as Rich Ford Sales, Inc.), is a New Mexico corporation with its principal place of business in Albuquerque, N. Mex., at the time the petition was filed. Petitioner, a Ford Motor Co. franchised dealer, during the calendar years 1971, 1972, 1973, and 1974 was engaged in the business of purchasing and selling at retail new and used Ford automobiles and trucks. Petitioner timely filed its corporate income tax returns, Forms 1120, for all relevant years with the Internal Revenue Service Center in Austin, Tex.

Prior to the calendar year 1974, the petitioner properly valued its new automobile and new truck inventory on the specific identification lower of cost or market, first-in/first-out (FIFO) method.

With its Federal income tax return for the calendar year 1974, the petitioner filed an "Application to Use LIFO Inventory Method" (Form 970) and properly elected to use the last-in/first-out (LIFO) method of valuing its inventory of new cars and new trucks. The LIFO election did not include used cars and trucks,

parts and accessories, demonstrators, and campers and other recreational vehicles.

In electing to use the LIFO method of valuing its inventories of new cars and new trucks for 1974 and subsequent calendar years, petitioner properly elected to use the dollar-value, link-chain method of valuing inventory. As authorized by the regulations, the petitioner also elected the earliest acquisitions during the year to determine cost of goods and closing inventory in excess of those in opening inventory.

In electing to use the LIFO method of valuing its inventory, petitioner indicated on the filed Form 970 that it was employing a single pool for all new cars and new trucks. At all times beginning with the calendar year 1974, petitioner has consistently employed the LIFO procedures for both tax and financial accounting purposes.

The dollar-value LIFO method values inventory not in terms of specific items, but in terms of dollars. Total units of inventory are converted into units of dollars for the accounting period. Under the dollar-value LIFO method of valuing inventory, the physical description of inventory items loses relevance, and inventory is defined in terms of dollars at the base year's dollar value.

Petitioner's method—the dollar-value, link-chain method—is an index method. It is not a method by which specific physical units of inventory are valued. The physical units of inventory are used to develop an index, and the index is used to measure inflation and cost increase and to determine value of a particular inventory at base year costs. An index in a period of rising inflation would be a number greater than one and when applied to inventory in base year dollars, would show an increment of inflation. Specific items of inventory are used for the purpose of developing an index in the dollar-value, link-chain method. The dollar-value method of valuing inventory involves an averaging process and emphasizes statistical averages over specific identification certainty.

In the link-chain method, generally, a representative portion of the closing inventory in a year is valued at both current cost and by the unit cost used in valuing the closing inventory in the preceding year. The ratio of current year cost to cost used in prior year reflects the increase in prices for the year. In the year of conversion, the cost will be identical and the resulting index

will be 1.00. In subsequent years, assuming rising prices, the ratio of current year cost to prior year cost will be a figure greater than 1.00. The object of the link-chain method is to relate statistically current price increases to all prior years. This is accomplished by attaining a so-called "cumulative index" for all years after the year of conversion. To obtain a cumulative index, the current index for the first year after conversion is multiplied by the current index of the year of conversion. Thereafter, the cumulative index is obtained by multiplying the current index by the prior year's cumulative index. Mathematically, the closing inventory valued at current prices, when divided by the cumulative index, will yield the value of closing inventory at base year cost—the LIFO value of the closing inventory. Because both opening and closing inventories will be valued at base year cost, cost of goods sold will reflect current purchases at current prices.

Petitioner, in computing its LIFO inventories for new cars and new trucks, undertook the following computational steps:

(1) Listing of all items in new vehicle inventory as of yearend, including vehicles in transit, by body style (i.e., two-door, four-door, station wagon, sedan, etc.). The number of items for each body style and their aggregate costs are listed.

(2) Listing of all items in new vehicle inventory as of the beginning of the year, including vehicles in transit, by body style. In the year of changeover, calculations are made for both steps 1 and 2. For all subsequent years, the information obtained in step 1 of the prior year becomes step 2 of the current year.

(3) Average cost of each new vehicle in the beginning and ending inventory is determined by dividing the total number of items for each body style into the total inventory cost for each body style.

(4) Ending inventory quantity per category and body style is valued at beginning inventory price.

(5) To determine the index to reduce current inventory to base year costs, a current to base year index is computed. The current year's ending inventory is valued at actual cost and at beginning inventory cost. The current to base year index is obtained by dividing ending inventory at actual cost by ending inventory at beginning inventory cost. Ending inventory valued at base year costs is the ending inventory at actual cost divided by the index. In years after the year of conversion, the current to base year

index is obtained by multiplying the current index times the prior year's cumulative index.

(6) Computation of increment (or decrement). The increment or decrement with reference to base year costs is the difference between the ending inventory valued at base year costs and the previous year's ending inventory at base year costs.

(7) The current year's inventory is then valued at earliest purchase cost (adjusted for cost increases between the first and the last purchases).

(8) The increment of inventory is then valued at earliest purchase value.

(9) Ending inventory at LIFO value. The previous year's inventory at base year costs is added to the increment at earliest purchase value.

(10) Total LIFO reserve. The total LIFO reserve is the ending inventory at actual cost less the ending inventory at LIFO value.

(11) The term "LIFO reserve" refers to the amount of increase in the petitioner's costs of sales resulting from its use of LIFO method of inventory valuation rather than specific identification lower of cost or market method.

Petitioner timely filed a Form 1139 for tentative carryback adjustments from 1974 to 1971, and 1972. The aforesaid carryback adjustment was allowed by the respondent and a refund was paid to petitioner for the calendar years 1971 and 1972.

Pursuant to an audit of petitioner's 1974 tax return, the respondent determined deficiencies for the calendar years 1971, 1972, and 1974. In computing the deficiencies, the respondent determined that the petitioner's LIFO reserve adjustment should be decreased from $487,311.11 to $204,282.74, a decrease of $283,028.37.

The statutory notice was prepared utilizing a separate pool for each model line and a separate pool for each model line body style. Respondent's position herein is that there should be one pool for each model line of new cars and new trucks, not body style pools. Petitioner concedes that petitioner's LIFO inventory reserve as set forth in its tax return is incorrect inasmuch as it fails to reflect the cost of vehicles in transit and an inventory write-down to 1973 costs. Respondent has conceded that in computing its new vehicle inventory under the LIFO method, petitioner properly included in its cost of new vehicles the price of factory options and dealer-installed accessories which were

placed on, and became a part of, new vehicles and inventory for 1974 and that a separate pooling for options and accessories is not necessary to clearly reflect income.

Based on petitioner's method as set forth above in utilizing correct figures, the petitioner's LIFO reserve calculation utilizing one pool for new cars and new trucks yields a LIFO reserve for 1974 of $532,714.28. Based upon petitioner's method, the petitioner's LIFO reserve calculation utilizing two pools for new cars and new trucks yields a LIFO reserve for 1974 of $533,018.68. The computations of the value of petitioner's LIFO inventory reserve utilizing respondent's one pool for each model line yields a total LIFO reserve of $512,176.95.

Under the terms of the franchise agreements between the petitioner and Ford Motor Co., all dealers are required to submit financial reports to the manufacturer. In addition to monthly statements, the petitioner utilizes audited and unaudited financial statements as a basis in making financial and other decisions with respect to its business and business practices, and with respect to decisions to expand, undertake capital improvements, acquire new assets, and other similar matters. For the purposes of monthly financial reporting to Ford Motor Co., sales of new automobiles and trucks are accounted for on a manufacturer's model-line basis. That sales of new automobiles and new trucks are so accounted for is for the benefit of Ford Motor Co., in that it provides the manufacturer information upon which to base its marketing decisions and to make decisions with respect to types of automobiles to manufacture. For the purposes of reporting inventory to Ford Motor Co. on the Ford Motor Co. format, inventories of new automobiles and new trucks are not accounted for on a manufacturer's model-line basis.

In petitioner's annual audited and unaudited financial reports, no reference is made to manufacturer's model lines, and inventory is accounted for in four broad categories: (1) New cars; (2) new trucks; (3) used vehicles; and (4) parts and other inventories.

Ford Motor Co. for the year 1974 manufactured several new cars and new trucks, all of which petitioner maintained in its inventory. For the year 1974, those new car and new truck models were as follows:

*New cars*
  A.  Pinto
  B.  Mustang
  C.  Maverick
  D.  Torino (Grand Torino)
  E.  Ranchero
  F.  Galaxy
  G.  Elite
  H.  Granada
  I.  LTD
  J.  Thunderbird

*New trucks*
  A.  Courier trucks (imported light-duty, ½-ton)
  B.  Bronco
  C.  Ford Models F–100 and F–150 (light pickup, ½-ton)
  D.  Ford Models F–250, F–260 (medium pickup, ¾-ton)
  E.  Ford Model F–350 (heavy pickup, 1-ton)
  F.  One-half-ton vans (commercial and passenger)
  G.  Three-quarter-ton vans (commercial and passenger)
  H.  F–500
  I.  F–600
  J.  F–610
  K.  F–700
  L.  F–800
  M.  F–900
  N.  U–900

For advertising purposes, the Ford Motor Co. distinguishes its automobile lines by size classifications: (1) Sub-compact, (2) compact, (3) intermediate, (4) large, and (5) luxury. Ford Motor Co. manufactures and markets its automobiles by manufacturer's model lines. These model lines are established for marketing purposes in trying to meet customer demand.

By 1978, Ford Motor Co. no longer manufactured an automobile designated as Maverick, Torino, Grand Torino, Galaxy, Elite, or Mustang. The Mustang automobile came out in April of 1964 and since that time has been sold as the Mustang or the Mustang II. Though the names are different, the automobile has generally been the same car.

Prior to manufacturing the Torino automobile, Ford Motor Co. manufactured essentially the same automobile under the name Fairlane. The Fairlane and Torino basically had the same

chassis and the same wheel base within an inch or two. They seated the same number of passengers, had the same engine, same transmission, and were generally the same automobile. The Fairlane was discontinued as a model line and replaced by the Torino, which had 10 different body styles; for example, a Torino two-door hardtop, a four-door colored hardtop, Grand Torino sports, and station wagons of different names.

In 1976 and 1977, Torino was discontinued and was replaced with a new automobile called the LTD II. The LTD II was broken down into nine body styles differing only cosmetically. By 1978, seven of the body styles had been eliminated and two new ones introduced. In 1980, the LTD II was replaced by the LTD. In 1978 and 1979, the Thunderbird and the LTD II were manufactured on the same chassis and had the same power train and engine. The only difference was cosmetic. It is common for two different model lines to have the same chassis, drive chain, and engine.

Prior to 1974, Ford Motor Co. manufactured an automobile known as the Crown Victoria. It became the Fairlane. It then became a Custom, a Custom 500, Galaxy, a Galaxy 500, a Star Liner, a Skyliner, and an LTD. In 1979, the automobile was again known as the Crown Victoria. Model lines throughout the Ford Motor Co. inventory have changed in a consistent fashion from 1974 through 1979. Ford Motor Co. produces automobiles for its four divisions that are identical to automobiles manufactured for its Lincoln-Mercury Division, but they have different names. In 1974, petitioner sold the Ford Pinto automobile. Ford Motor Co. has advised the petitioner that it intends to discontinue the Pinto and replace it with an automobile known as the Erica, which will still be a small automobile and will differ from the Pinto only cosmetically.

Ford Motor Co. pickup trucks are essentially the same design. The variation from model line basically involves the weight of the vehicle, the undergirding, and the gauge of the metal going into the chassis. These items differ because larger trucks are designed to carry more weight. Ford Motor Co. vans vary by manufacturer model lines for the same differences; that is, size and weight-bearing capacity.

Each year before Ford Motor Co. introduces a new model line, the management of petitioner attempts to assess its basic sales history to determine, among other things, what its daily and

monthly supply of vehicles should be to maximize properly its marketing effort and minimize its continued inventory investment. Management would take into consideration Ford Motor Co. projections concerning estimates of the total market for all vehicles for the coming year and try to determine what inventory level would be necessary to enable it to sell that number of vehicles a month to maintain its continued financial health. The decisions are made basically with respect to total vehicles, and only after it determines the total vehicles it must stock and sell does petitioner make a decision with respect to manufacturer's model line mix. In determining inventory levels, petitioner, in addition to considering its physical inventory, must consider its inventory costs. Thus, in determining how much inventory to carry, petitioner must determine what it can afford in terms of dollars. If a decision is made to cut inventory, it is first made with respect to a total dollar inventory level. Once a decision is made to cut, then the petitioner will assess its sales history and sales experience to determine what types and models of vehicles to eliminate or reduce. Determinations and decisions concerning inventory are based only secondarily on manufacturer's model lines and then the decision is a marketing decision, not an investment decision.

## OPINION

Petitioner accounted for its inventory by utilizing the dollar-value LIFO method of accounting. The first question presented is the proper composition of the pool, or the number of pools, that petitioner, a Ford Motor Co. franchised dealer, must utilize in determining the dollar value of its inventory.

Any taxpayer may elect the dollar-value LIFO method of accounting "provided such method is used consistently and clearly reflects the income of the taxpayer." Sec. 1.472–8(a), Income Tax Regs. The parties have stipulated that petitioner properly elected the dollar-value LIFO method and the link-chain method for determining the dollar value of the pools.

The object of the dollar-value LIFO inventory calculation is to determine which goods at the close of the taxable year represent those in opening inventory plus those which represent acquisitions during the year. Sec. 472, I.R.C. 1954. The determination is made by comparing quantities of goods expressed in terms of dollars in the opening and closing inventories. Essential to this

determination is the "grouping of the goods contained in the inventory into a pool or pools." *Wendle Ford Sales, Inc. v. Commissioner*, 72 T.C. 447, 453 (1979). It is the fluctuation in the value of the pool which determines the increase or decrease in cost of goods sold. If the pool contracts in value, an inventory liquidation will have occurred—i.e., historic cost will represent, at least in part, the cost of goods sold in the year of liquidation. Therefore, in industries where products are frequently improved or replaced, the composition of the pool is of vital importance.

Petitioner contends that it is entitled to use a single pool for new cars and new trucks. Respondent, on the other hand, argues that each model line should constitute a separate dollar-value pool. The burden of proof is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure. Because the issue involves a change in accounting method and the proper method of measuring inventory, petitioner bears the heavy burden of proving that respondent's determination is arbitrary. *Lucas v. Structural Steel Co.*, 281 U.S. 264, 271 (1930).

There are no fixed criteria for determining the proper composition of a pool. Section 1.472–8(c), Income Tax Regs., provides in pertinent part that items of inventory in the hands of a retailer "shall be placed into pools by major lines, types, or classes of goods. In determining such groupings, customary business classifications of the particular trade in which the taxpayer is engaged is an important consideration." Respondent argues that petitioner's sales reports to Ford Motor Co. on a model line basis evidence a "customary business classification." He therefore contends that his determination is reasonable, not arbitrary and not an abuse of discretion.

The sales reports relied upon by respondent were required by Ford Motor Co. under the franchise agreement. The record clearly establishes that these reports were utilized by Ford Motor Co. for marketing and manufacturing purposes only. In reporting its inventory to Ford Motor Co. and on its financial statements, petitioner did not report by model line. Further, petitioner's president and two expert witnesses testified that the customary business practice for dealers utilizing the dollar-value method was a single pool for new cars and new trucks. For the purposes of evidencing trade practice, we note that a single pool for new cars and new trucks was utilized in the case of *Wendle Ford Sales, Inc. v. Commissioner, supra* at 453. However, we

must add that the Court in *Wendle Ford* did not consider the propriety of the single pool because the parties stipulated thereto. Respondent's error in relying upon the sales reports is that he viewed them from the eyes of the manufacturer and misconstrued their purposes.

Respondent also contends that a model line constitutes a "major line" within the meaning of the relevant regulation. We note immediately that section 1.472–8(c), Income Tax Regs., is in the disjunctive and that petitioner is entitled to choose between "major lines, types, or classes of goods." Section 1.472–8(a), Income Tax Regs., provides in part that "Liquidations and increments of items contained in the pool shall be reflected only in terms of a net liquidation or increment for the pool as a whole. Fluctuations may occur in quantities of various items within the pool, new items which properly fall within the pool may be added, and old items may disappear from the pool, all without necessarily effecting a change in the dollar value of the pool as a whole."

Evident from this language is the respondent's recognition that a pool will consist of a diversity of products. The extent of the diversity depends upon the customary business classification discussed above. The regulations state that departments in a department store represent "customary business classifications."[1] For example, in kitchen appliance departments a cast-iron skillet and a sophisticated microwave oven would be different items in a single pool.

Contrasting this diversity within a department store, respondent contends that with respect to Ford Motor Co. dealers, an LTD and an LTD II must be segregated into separate pools. We fail to see the qualitative variance necessary to treat these items as separate lines, types, or classes of goods. Because automobile manufacturers are constantly changing model lines, a separate pool for each would result in yearly inventory liquidations. The liquidations would occur notwithstanding petitioner's continued or increased investment in the same quantity of vehicles. The termination of production of the Fairlane, Custom, Custom 500, Galaxy, Galaxy 500, Starliner, LTD, Thunderbird, Mustang, Maverick, Torino, Ranchero, and Elite should not result in

---

[1]See sec. 1.472–8(c), Income Tax Regs.

liquidations when the petitioner is forced to reinvest in Mustang II, LTD II, or Pinto, or whatever other similar automobile is used to replace the previous model line. This is especially true where the new model line represents only a cosmetic difference and where the name of the vehicle often disappears only to reappear in subsequent years. These types of changes are evident in the history of the Crown Victoria set out in the findings of fact. Further, the changes are beyond the dealer's control and represent only a marketing strategy and not a significant change in the character of the inventory.

To accept respondent's method would result in matching current revenues with earlier lower cost even though petitioner's investment in the particular product had continued. It is just this type of mismatching which LIFO was intended to avoid. Respondent's 24-pool method would, in substance, place petitioner on the specific goods LIFO method. Thus petitioner would be denied the right to utilize the dollar-value method, a method that it is entitled to use. See *Klein Chocolate Co. v. Commissioner*, 32 T.C. 437 (1959), and sec. 1.472–8(a), Income Tax Regs.

In *Wendle Ford*, we concluded that the addition of a catalytic converter and a solid state ignition system did not make a 1975 Ford a different "item" than a 1974 Ford within the meaning of section 1.472–8(e), Income Tax Regs. The rationale of the Court was that "to hold otherwise would * * * ignore the fundamental purpose underlying the development of the dollar-value method" as well as "create serious practical impediments to its application." *Wendle Ford Sales, Inc. v. Commissioner, supra* at 456. That rationale is equally applicable to the instant case and supports our finding that respondent's single pool per model line is arbitrary and cannot be sustained.

Finally, we consider whether petitioner's method of utilizing a single pool for new cars and new trucks complies with the statute and regulations. Petitioner contends that the "customary business classification" for dealers is a single pool and therefore it satisfies the regulations. Respondent, in the alternative, argues that if his 24 pools are not accepted, the Court should find that at least two or more pools are required.

Petitioner contends that it is in the transportation business and that whether it sells a truck or a car is irrelevant. Therefore, it claims that a single "transportation pool" would be sufficient.

However, petitioner also concedes that used vehicles and recreational vehicles belong in separate pools. The fact that these are also transportation vehicles is evidence that a "transportation pool" would be overly broad. In addition, more than a single pool is necessary to reflect the inherently different uses for which a car and a truck are intended. In fact, even the advertising campaigns used by Ford Motor Co. recognize this distinction. For example, we are told that Ford trucks are "built tough" and that Granadas "look and ride like a Mercedes." This marketing approach dramatizes the more commercial nature of trucks versus the typical personal uses of a car. Finally, the fact that requirements for registration of trucks and licensing of truck operators differ from the requirements for registration and operation of cars supports a conclusion that the two should be placed in separate pools.

In a case released today, *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708 (1981), this Court held that a franchised Chevrolet dealer of new cars and trucks must place new cars and new trucks in separate pools. The Court in *Fox* found that the cars and trucks are two separate classes of goods. The Court took note of the fact that there were more than mere cosmetic differences between the two products and that licensing requirements for trucks, both with respect to the vehicle and the operator, can differ. That case is controlling, and, of course, its rationale is equally applicable in the instant case.

Petitioner is a franchised dealer for both automobiles and trucks. Apparently, separate sales statistics are kept for each. In fact, petitioner stated at trial that it was Ford Motor Co.'s number one or number two truck dealer. We are convinced that the two pools represent distinct classes of goods, each pool containing items which are substantially similar to those in their respective pools. Accordingly, new cars and new trucks should be placed in separate pools.

The use of two pools would not, as a practical matter, prevent petitioner from employing the dollar-value method. Dollar-value LIFO pooling aims to allow matching of revenues with costs of a group of inventory items which are substantially similar. See sec. 1.472–8(b)(3), Income Tax Regs. This aim is achieved by a two-pool approach; the two-pool approach succeeds in matching revenues from truck sales with the costs of producing such trucks, and revenues from the sale of cars with the costs of

producing such cars. In addition, petitioner's income, for income tax purposes, would be clearly reflected because of this matching of revenues and costs. Thus, the objections found with respect to respondent's 24-pool approach and petitioner's 1-pool approach are not applicable to a 2-pool approach. To the contrary, the fundamental purposes of the dollar-value method are enhanced. Therefore, notwithstanding our earlier determination that one pool for new cars and new trucks is the customary business classification, this factor is outweighed by the clear reflection of income obtained by utilizing two pools. See *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979). Accordingly, we sustain respondent's contention that new cars and new trucks must be placed in separate pools.

Finally, respondent contends that petitioner must treat each model line as a different "item" within the meaning of section 1.472-8(e)(2)(i), Income Tax Regs. Therefore, respondent apparently contends that petitioner must compute a separate yearly index for each item of a pool, which indexes will, in aggregate, represent the yearly index for the pool. We do not agree.

The regulation cited by respondent relates to the double-extension method. Petitioner utilized the link-chain method.[2] Respondent recognizes that in the link-chain method an index is computed by double-extending a representative portion of the inventory in a pool. We believe that as long as petitioner selects a representative portion of the inventory in a particular pool to compute an index for the pool under the link-chain method, the computation will be valid. On brief, respondent agreed with "petitioner's computation of its LIFO reserve except for the number of pools (and indexes) which should be used." We have already found that new cars are to be placed in a separate pool from new trucks. Further, we have determined that one representative index is sufficient for a pool. Therefore, we do

---

[2]Sec. 1.472-8(e)(1), Income Tax Regs., provides that "the use of any so-called 'link-chain' method will be approved for taxable years beginning after December 31, 1960, only in those cases where the taxpayer can demonstrate to the satisfaction of the district director that the use of either an index method or the double-extension method would be impractical or unsuitable in view of the nature of the pool." In light of respondent's concession that petitioner properly elected the link-chain method, we assume, without deciding, that he made such a showing to the District Director.

not believe that separate indexes must be computed for each item in a pool, and we reject respondent's final argument.

*Decision will be entered under Rule 155.*