T.C. Memo. 1996-368


UNITED STATES TAX COURT


E.W. RICHARDSON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27308-92.                     Filed August 12, 1996.


During the years in issue, P was the sole
shareholder of I.  I was a subch. S corporation that,
among other things, provided management consulting
services and operated an automobile dealership through
one of its divisions.  I valued its new car and new
truck inventories on the last-in, first-out (LIFO)
method.  During the years in issue, I owned and
maintained an airplane.  The airplane was used in
connection with I's operation of its divisions and in
providing management consulting services.
     1.  Held:  When I began defining its items of
inventory for its new car LIFO pool by model line,
rather than body size, it changed the treatment of a
material item.  This change in item was material
because it affected the computation of beginning and
ending inventory.  Since I changed the treatment of a
material item used in its overall method of inventory
accounting, it changed its method of accounting.  Sec.
446(e), I.R.C.; sec. 1.446-1(e)(2)(ii)(a),(c), Income
Tax Regs.

2.  Held, further, I's method of accounting for its new car and new truck inventories did not clearly reflect income, as I inconsistently defined its items of inventory for both its new car and new truck pools. Sec. 446(b), I.R.C.; secs. 1.471-2(b), 1.472-8(a), Income Tax Regs.

3.  Held, further, R did not abuse her discretion in determining that I must define its items of inventory for its new car and new truck LIFO pools by model code.  Sec. 446(b), I.R.C.

4.  Held, further, the expenses I incurred in owning and operating its airplane during the years at issue are allowable under sec. 162, I.R.C.

Patricia Tucker, for petitioner.

Thomas F. Eagan, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined deficiencies in, additions to, and a penalty on petitioner's Federal income tax for taxable years 1988 and 1989 as follows:

|  |  | Additions to Tax and Penalty | | |
|  |  | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6661 | 6662(a) |
| 1988 | $656,486 | $11,971 | $5,704 | -0- |
| 1989 | 323,343 | -0- | -0- | $34,003 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions,[1] the issues for decision are: (1) Whether Richardson Investments, Inc. (Investments), made an unauthorized change in method of accounting. We hold it did. (2) Whether Investments' method of inventory accounting clearly reflected income. We hold it did not. (3) Whether respondent abused her discretion in determining that Investments should define its items of inventory for dollar-value LIFO purposes by model code. We hold she did not. (4) Whether Investments' claimed deductions arising from the ownership and operation of an airplane are allowable. We hold that such deductions are allowable.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. Petitioner, E.W. Richardson, resided in Albuquerque, New Mexico, on the date the petition was filed.

During the taxable years 1988 and 1989, petitioner was the sole shareholder of Investments, a subchapter S corporation. Investments was incorporated under the laws of the State of New Mexico on February 21, 1961. Investments elected the status of an S corporation on January 1, 1986. Prior to 1986, Investments owned three subsidiaries: Rich Ford Sales, Rich Ford Leasing,

---

[1] Pursuant to a stipulation of agreed adjustments and a concession on brief by respondent, the parties resolved all but four of the issues raised by the pleadings. We leave it to the parties to include these adjustments in their Rule 155 computations.

and Richardson Properties. In 1986, the subsidiaries were liquidated into Investments and thereafter operated as divisions of Investments. During the years at issue, Investments, through its Rich Ford Sales division, operated a franchised Ford Motor Co. (Ford) automobile and truck dealership in Albuquerque, New Mexico, and also held franchises for the sale of Daihatsu automobiles and Daihatsu and Isuzu trucks.

Prior to the taxable year 1974, Investments valued its new car and new truck inventory on the specific identification, lower of cost or market, first-in, first-out (FIFO) method. With its Federal income tax return for the taxable year 1974, Investments filed Form 970, Application to Use LIFO Inventory Method, the Commissioner electing to use the last-in, first-out (LIFO) method of valuing its inventory. Specifically, Investments elected to use the dollar-value, link-chain, earliest-acquisition method of inventory valuation with a single LIFO inventory pool for both its new cars and new trucks.[2]

Investments' 1974 Federal corporate income tax return was audited by the Commissioner. As a result of that audit, the Commissioner issued a notice of deficiency. The adjustments in the notice of deficiency were redetermined by this Court in Richardson Invs., Inc. v. Commissioner, 76 T.C. 736 (1981) (Richardson I).

---

[2] Although Investments checked the "double-extension method" block on its Form 970, respondent concedes that petitioner duly elected the link-chain method of computing the last-in, first-out (LIFO) value of its inventory.

The primary issue in Richardson I was whether Investments "properly adopted the use of a single LIFO inventory pool in computing inventory values pursuant to the dollar-value, link-chain LIFO method". Id. at 737. Investments argued that it was entitled to use a single pool for new cars and new trucks, and the Commissioner argued that each model line[3] should constitute a separate dollar-value pool. Id. at 745. The Court rejected Investments' method of utilizing a single pool for new cars and new trucks, and it rejected the Commissioner's single pool per model line argument. Id. at 747. Rather, the Court held that "new cars and new trucks should be placed in separate pools." Id. at 748.

After the opinion in Richardson I was filed (May 11, 1981), Investments recomputed its taxable year 1974 LIFO inventory calculation, placing new cars and new trucks in separate pools. The calculation was submitted to the Court under the Court's Rule 155 procedure, and a decision was entered. Investments and the Commissioner reached an agreement on Investments' inventory calculations for taxable years 1975, 1976, and 1977, conforming those calculations to the decision in Richardson I. For taxable years 1978, 1979, and 1980, Investments amended its tax returns to conform its inventory calculations to the decision in Richardson I.

---

[3]     The parties have stipulated that vehicle "model lines" are the different vehicle product lines offered by the manufacturers; for example, Ford Motor Co. offers the Mustang model line, the Escort model line, etc.

In its recomputations for the taxable years 1974 through 1980, Investments defined the units used to compute beginning of the year value of ending inventory for its new car pool by vehicle body size (body size).[4] For example, in 1980, Investments separated its new cars into six categories: Full size, luxury, midsize, compact, subcompact, and Escort. The full-size category included eight model codes of full-size LTD automobiles. The luxury category included one model code of Thunderbird automobiles. The midsize category included four model codes of midsize LTD automobiles and two model codes of Granada automobiles. The compact category included four model codes of Fairmont automobiles. The subcompact category included four model codes of Mustang automobiles and three model codes of Pinto automobiles. The Escort model line was introduced for the first time in 1980.

Starting in 1981, Investments defined its new car pool inventory units by model line. Thus, each model line was a different category, e.g., Mustang model line, Escort model line, Tempo model line, etc. After it began defining its new car pool inventory units by model line, in place of body size, Investments did not restate its LIFO indexes for 1974 through 1980 based on the model line classification. Furthermore, Investments did not file Form 3115, Application for Change in Accounting Method, or

---

[4] All references to "inventory units" are to the definition of the units used to compute beginning of the year value of ending inventory. See discussion in sec. B.2., infra pp. 21-22.

otherwise request respondent's consent to change its LIFO inventory valuation method.

In its new truck pool for years 1979 through 1985, Investments treated all of its vans (E series) and extended body vans (S series) as one inventory unit, but separated its full-size pickups (F series), extended cab full-size pickups (X series), and four-door full-size pickups (W series) into three different inventory units by load-carrying ability (i.e., 1/2-ton, 3/4-ton, and 1-ton).

For 1986, 1987, and 1988, Investments treated all of its full-size pickups (the F, X, and W series) as one inventory unit and all of its vans (E series) and extended body vans (S series) as another inventory unit.  For 1989, Investments treated each of its E series vans, its S series vans, its F series pickups, its W series pickups, and its X series pickups as separate inventory units.

For its Ranger trucks (R series) and Aerostar vans (A series), Investments always treated each of those model lines as one inventory unit, regardless of any submodels that were introduced; but it always separated its Bronco trucks (U series) by size; i.e., the full-size model (U15) and the Bronco II models (U12 and U14).

In addition to operating its automobile dealership through its Rich Ford Sales division, Investments, among other things, provided management consulting services to its operating

divisions and certain "other entities". The "other entities" were Pioneer Ford Sales, Inc. (Pioneer), Fiesta Lincoln-Mercury, Inc. (Fiesta Lincoln), Heritage Auto Center, Inc. (Heritage), Fiesta Dodge, Inc. (Fiesta Dodge), Sunland Ford, Inc. (Sunland), Imports of Albuquerque, Inc. (Imports), Deep Seal International, Inc. (Deep Seal), Horizon Life Insurance Co., Inc. (Horizon), Ranch Partnership (Ranch), Valley Ford Sales, Inc. (Valley), Warranty Protection Co., Inc. (Warranty), Theft-Shield International, Inc. (Theft-Shield), and Arizona Aftermarket Associates, Inc. (Aftermarket).

Pioneer, Fiesta Lincoln, Heritage, Fiesta Dodge, Sunland, and Imports each owned and operated dealerships for the sale of new automobiles and trucks. Deep Seal provided paint sealant to be applied on new vehicles at the time of sale. Horizon sold credit life insurance on financed vehicles at the time of sale. Theft-Shield provided theft protection for new vehicles. Warranty provided extended service warranties for new vehicles at the time of sale. Valley and Aftermarket provided accessory parts for new vehicles at the time of sale. Ranch owned and operated a large cattle ranch.

Petitioner had an ownership interest in each of the other entities, except Sunland. Petitioner was a special trustee of a business trust which owned Sunland. Petitioner's interest in the other entities varied from 15 percent of Warranty to 100 percent

of Imports. Petitioner owned 50 percent or more of 7 of the 13 other entities.

The management services provided by Investments included consulting in the following areas: Accounting, finance, legal, sales, marketing, and personnel management. These services were provided both periodically and on an as-needed basis.

The fees Investments charged for management services were billed and paid monthly. During the taxable years 1988 and 1989, Investments billed management fees of $814,452 and $970,997, respectively.

During 1988 and 1989, Investments owned a Lear Jet Model 25D airplane (airplane). Investments used the airplane for travel associated with the operating divisions and travel associated with its management services activity.

In regard to the operating divisions, the airplane was used by Rich Ford Sales to transport its employees to conventions and seminars. The airplane was also used to fly key management personnel to Detroit, Michigan, to respond to urgent business Rich Ford Sales had with Ford. Also, Rich Ford Sales used the airplane to take employees to automobile shows.

In connection with the management services activity, Investments' employees used the airplane to travel to the following other entities during the taxable years at issue: Pioneer, Fiesta Lincoln, Fiesta Dodge, Heritage, and Sunland. Pioneer was located in Phoenix, Arizona. Fiesta Lincoln and

Fiesta Dodge were located in San Antonio, Texas.  Heritage was located in Kirkland, Washington, and Sunland in Apple Valley, California.  The airplane allowed Investments' employees to provide management services in person to each of these out-of-town dealerships.

Investments generally used the airplane only if four or more people needed to travel.  If fewer than four people were traveling, the employees would usually fly commercially, as use of the airplane in such circumstances was inefficient.  Use of a private airplane saved time, as employees could fly to an out-of-town dealership and return to Albuquerque, New Mexico, in the same day, or they could visit two dealerships in the same day.  This was important, because the down time associated with having a number of employees waiting for a commercial flight was costly.  Use of the private airplane also saved travel expenses, because the reduced travel time often reduced the room and board costs that would be associated with commercial travel.

Overall, the airplane was flown a total of 112.98 and 68.30 hours for taxable years 1988 and 1989, respectively.  The airplane was flown 63.77 and 52.30 hours for management services for taxable years 1988 and 1989, respectively.  Accordingly, the airplane was used 56 percent and 77 percent of the time in 1988 and 1989, respectively, for management services.

The airplane was also used to fly employees to conventions, seminars, and training in 1988.  It was used 12.86 hours for this

purpose, or 11 percent of its total 1988 use. In addition, the airplane was flown for crew training, maintenance, repair, and testing purposes. This use amounted to 33.45 hours in 1988 and 9.60 hours in 1989, representing 30 percent and 14 percent of the total use, respectively. Finally, petitioner used the airplane wholly or partially for personal reasons on five occasions during the years at issue. Petitioner used the airplane for 2.9 hours in 1988 and 6.4 hours in 1989, or 3 percent and 9 percent of the total time, respectively.

When the airplane was used to provide management services, airplane service fees incurred for such travel were billed separately from the management fees. In these situations, the airplane pilot would prepare the airplane service bill, and Investments' accounting department would process the bill and separately charge the customer involved. For the years at issue, the airplane rental fees charged the other entities were $700 per hour, plus out-of-pocket expenses of Investments' employees for meals, entertainment, and lodging. The airplane pilot set the $700 hourly airplane rental fee, based on the anticipated expenses associated with 200 hours of billable flight time. That estimated hourly fee was low for 1988 and 1989, but the estimated fee was subsequently adjusted upward.

When petitioner used the airplane for personal use, he was billed for and paid the direct costs of the flights; these direct costs included, for example, fuel, hangar storage, tie-down,

etc., for each flight. These charges varied from $450 per hour to $760 per hour during 1988 and 1989.

Investments' total costs of owning, operating, and maintaining its airplane, exclusive of pilot salary, during 1988 and 1989 were $218,452.14 and $142,427.85, respectively. Investments collected a separate rental fee from Pioneer, Fiesta Lincoln, Fiesta Dodge, Heritage, Ranch, and Sunland for the use of its airplane during 1988 and 1989. The airplane rental fees collected by Investments during 1988 and 1989 were $48,048.50 and $37,674, exclusive of meals, lodging, etc., respectively.

OPINION

The issues in the instant case fall into two principal groups which we will discuss under separate headings: Accounting for Inventories and Airplane Expenses.

Accounting for Inventories

To set the stage for our review of respondent's determinations, a discussion of the dollar-value LIFO method of inventory accounting used by Investments to determine its ending inventory is helpful.

A. Dollar-Value LIFO

Section 471 requires the use of inventories whenever necessary in order to clearly reflect income. Sec. 471(a); Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 719 (1981). The regulations define "necessary" as being whenever the production, purchase, or sale of merchandise is an income-producing factor.

Sec. 1.471-1, Income Tax Regs. When inventories are required, they must be maintained on a basis that conforms as nearly as possible to the best accounting practice in the taxpayer's trade or business and that most clearly reflects income. Sec. 471(a); Fox Chevrolet, Inc. v. Commissioner, supra at 719-722.

In a merchandising business, gross income from sales means total sales less cost of goods sold (COGS). Sec. 1.61-3(a), Income Tax Regs. COGS for the year is determined by subtracting the value of ending inventory from the sum of the value of beginning inventory and the cost of purchasing or producing goods during the year. Primo Pants Co. v. Commissioner, 78 T.C. 705, 723 (1982). As a general rule, taxpayers will want to keep ending inventory as low as possible so that COGS, which is an offset to gross receipts, is made as large as possible, thereby minimizing gross income. Hamilton Indus., Inc. & Sub. v. Commissioner, 97 T.C. 120, 129 (1991).

Section 472 permits taxpayers to value their inventories under the LIFO method. In contrast to the FIFO method of inventory valuation, which treats the first goods acquired as the first goods sold, the LIFO method of inventory valuation treats the last goods acquired as the first goods sold. Sec. 472(b); Fox Chevrolet, Inc. v. Commissioner, supra at 722. Accordingly, under the LIFO method, the earliest goods acquired are treated as the goods remaining in ending inventory. Fox Chevrolet, Inc. v. Commissioner, supra at 722. During a period of rising costs, the

use of the LIFO method generally results in lower taxes because ending inventory will be lower, and therefore COGS will be higher. Amity Leather Prods. Co. v. Commissioner, 82 T.C. 726, 731 (1984). "The theory behind LIFO is that income may be more accurately determined by matching current costs against current revenues, thereby eliminating from earnings any artificial profits resulting from inflationary increases in inventory costs." Id. at 732.

In computing LIFO inventory values, two basic approaches are used: The specific-goods method and the dollar-value method. Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 130; see secs. 1.472-2, 1.472-8, Income Tax Regs. We have previously compared the specific-goods LIFO method with the dollar-value LIFO method:

> Under the specific-goods method, the physical quantity of homogeneous items of inventory at the end of the taxable year is compared with the quantity of like items in the beginning inventory to determine whether there has been an increase or decrease during the year. Because the specific-goods method requires the matching of physical units, practically speaking, it is only used as a method for valuing inventories in those industries with inventories which contain a limited number of items with quantities that are easily measured in units. In contrast to the specific-goods method, the dollar-value method measures increases or decreases in inventory quantities, not in terms of physical units, but in terms of total dollars. Thus, to determine whether there has been an increase or decrease in the inventory during the year, the ending inventory is valued in terms of total dollars that are equivalent in value to the dollars used to value the beginning inventory. Because it is not predicated upon the matching of specific items, use of the dollar-value method permits the application of the LIFO principle in those industries with complex inventories containing a vast number of items. * * *

[<u>Wendle Ford Sales, Inc. v. Commissioner</u>, 72 T.C. 447, 452 (1979); citations omitted.]

Investments used the dollar-value LIFO method to calculate its ending inventory. Under the dollar-value method, inventory is grouped into "pools"[5] composed of "items". <u>Hamilton Indus., Inc. & Sub. v. Commissioner</u>, <u>supra</u> at 131; sec. 1.472-8(a), Income Tax Regs. To determine whether there has been a change in inventory value from the prior year, the current year aggregate cost of the items in ending inventory for each pool is valued at "base-year cost"; base-year cost is the aggregate cost of all items in the pool at what they cost (or would have cost) as of the beginning of the taxable year for which the LIFO method was first adopted. Sec. 1.472-8(a), Income Tax Regs. After converting the current year ending inventory from current-year cost to base-year cost, the value of the beginning and ending inventory in terms of base-year cost is compared to determine whether an increase or decrease in inventory value has occurred. <u>Id.</u> Thus, to ascertain whether a taxpayer's ending inventory has increased or decreased in real quantity terms, it is necessary to compare the value of the beginning and ending inventories of a particular taxable year expressed in terms of the same dollar

---

[5]  In the case of a retailer, such as Investments, the regulations provide that the inventory shall be grouped by "major lines, types, or classes of goods." Sec. 1.472-8(c), Income Tax Regs. Investments, pursuant to <u>Richardson Invs., Inc. v. Commissioner</u>, 76 T.C. 736 (1981), used two pools, one for new cars and one for new trucks.

equivalent; i.e., base-year cost.  1 Schneider, Federal Income Taxation of Inventories, sec. 14.01[1], at 14-4, 14-5 (1996).

The regulations contain four alternative approaches to determine base-year cost:  The double-extension method, the index method, the link-chain method, and the retail method.  Sec. 1.472-8(e)(1), Income Tax Regs.  Investments used the "link-chain" method of computing the base-year cost of the inventory in its LIFO pools.[6]

More specifically, Investments used the link-chain, dual-index method for the determination of quantity changes and for the valuation of increments in its LIFO pools.  Under the dual-index method, a cumulative deflator index is used to value ending inventory at base-year cost, and a layer-valuation index is used to value increments in the pool.

Each year Investments calculates an annual and a cumulative deflator index for each pool in order to convert current year ending inventory at "actual cost"[7] to what it would be at base-

---

[6]    Although the regulations do not contain a specific description of the link-chain methodology, or an example of such methodology, the parties have stipulated that Investments' link-chain methodology, as described below, was appropriate.  For a more detailed description of the link-chain methodology, see Rev. Proc. 92-79, sec. 4, 1992-2 C.B. 457, 460 (describing alternative LIFO method for automobile dealers); see also 1 Schneider, Federal Income Taxation of Inventories, sec. 14.02[3][b], at 14-96 (1996).

[7]    In arriving at the actual cost of its ending inventory in its new car and new truck pools each year, Investments uses the actual invoice cost of each vehicle in inventory.

year cost.  To compute the annual deflator index, Investments divides the ending inventory at actual cost by the beginning of the year value of ending inventory.[8]  This results in a current year annual deflator index.  The current year annual deflator index is then multiplied by the annual deflator index from all prior years to arrive at the cumulative deflator index.  The ending inventory on the books at actual cost is then divided by the cumulative deflator index to arrive at the ending inventory expressed at base-year cost.[9]

Once ending inventory at base-year cost is computed, it is compared to beginning inventory at base-year cost.  See sec. 1.472-8(e)(2)(iv), Income Tax Regs.  If ending inventory valued at base-year cost exceeds beginning inventory at base-year cost,

---

[8]     Investments divided the total beginning of the year number of vehicles for each unit of inventory, e.g., model line, by the total beginning of the year cost for all the vehicles in that unit, resulting in an average cost for the unit.  This average cost was then multiplied by the number of vehicles on hand and in transit at yearend for that particular unit to determine the beginning of the year value of ending inventory for the unit. The total for each unit was then summed to reach beginning of the year value of ending inventory.

[9]     Comparing the link-chain method with the double-extension method, one commentator has noted:

The basic approach of the link-chain method is comparable to the double-extension method, except that the base year is rolled forward each year.  Thus, instead of referring back to a fixed base period for purposes of pricing items, each years's current costs are restated in terms of the prior year's costs.  These costs may then [be] indexed back to the base year through the use of a cumulative price index. [1 Schneider, supra at 14-96; fn. refs. omitted.]

there is an increment in inventory.  See id.  The LIFO value of
such increment is then computed, see id., and the increment is
added to beginning inventory for the pool to determine the
current year's LIFO ending inventory for the pool, see id.; see
also Fox Chevrolet, Inc. v. Commissioner, 76 T.C. at 733 n.16.

If ending inventory valued at base-year cost is less than
beginning inventory at base-year cost, there is a decrement in
inventory.  See sec. 1.472-8(e)(2)(iv), Income Tax Regs.  When
there is decrement, the current year's LIFO ending inventory is
the beginning inventory reduced by the decrement.  See id.

Once the total LIFO ending inventory is calculated, the
ending inventory figure is subtracted from the sum of the values
for beginning inventory and purchases during the year to produce
the COGS for the current year.  Fox Chevrolet, Inc. v.
Commissioner, supra at 722.

B. Unauthorized Change in Method of Accounting

Respondent determined that Investments made an unauthorized
change in method of accounting when it changed the definition of
its inventory units for its new car pool from model code[10] to

---

[10]     The parties have stipulated that vehicle "model code" is
synonymous with vehicle "body style".  For the remainder of the
opinion, we will use model code to refer to both model code and
body style.  Furthermore, the parties have stipulated that a
vehicle model code is a code given to each vehicle by the
manufacturer that differentiates the different body
configurations and interior styling packages of vehicles within
each model line (e.g., a two-door sports model, a four-door sedan
with standard interior, etc.).

body size in its inventory computations subsequent to Richardson I.  In the alternative, respondent determined that Investments made an unauthorized change in method of accounting when it changed the definition of its inventory units for its new car pool from body size to model line in taxable year 1981. Petitioner asserts that Investments did not make an unauthorized change in method of accounting in either instance.

Section 446(e) provides that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary."[11]  The Internal Revenue Code does not define the phrase "change in method of accounting".  However, the regulations under section 446(e) provide that a "change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan."  Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  Furthermore, with respect to inventories, the regulations provide:

> A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting.  Also a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting. [Sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs.]

---

[11]    Consent is requested by filing an application on Form 3115. Sec. 1.446-1(e)(3)(i), Income Tax Regs.

The regulations define "material item" as "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.[12]

The regulations also define certain situations in which a change does not rise to the level of a change in method of accounting. Specifically, section 1.446-1(e)(2)(ii)(b), Income Tax Regs., provides:

> A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability * * *. Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. * * * A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. * * *

1. Unauthorized Change After Richardson I

Respondent determined that Investments originally elected to define its inventory units for its new car pool by model code but

---

[12] Sec. 472 and the regulations thereunder provide more specific guidance on when a change in method occurs in the LIFO method of accounting. Sec. 472(e) provides that a taxpayer may not change from the LIFO method to another method of inventory accounting without the consent of the Commissioner. With respect to the dollar-value method of LIFO, the regulations provide that a taxpayer may not change its pricing method, e.g., link-chain method, without the consent of the Commissioner. Sec. 1.472-8(e)(1), Income Tax Regs. In addition, the regulations provide that any change in pooling used in computing LIFO inventories requires the consent of the Commissioner. Sec. 1.472-8(g)(1), Income Tax Regs. Here, respondent does not argue that Investments changed its overall method of accounting for inventory, i.e., the dollar-value LIFO method, nor does she argue that Investments changed its overall pricing method or the number of pools it utilized.

made an unauthorized change in method of accounting when it changed the definition of such units to body size in its LIFO inventory computations subsequent to Richardson I. Petitioner asserts that Investments elected to define its inventory units for its new car pool by body size, and it consistently applied the body size definition from the year of election through the computations subsequent to Richardson I. In the alternative, petitioner asserts that respondent implicitly consented to a body size definition of its inventory units.

To determine the scope of a taxpayer's LIFO election, we examine the facts and circumstances of the case. First Natl. Bank v. Commissioner, 88 T.C. 1069, 1080 (1987). In First Natl. Bank, we addressed the issue of whether a taxpayer had elected to include soil aggregate in its LIFO inventory. After analyzing the scope of the taxpayer's business, the information provided on its Form 970, its tax returns, and other business records, we held that the taxpayer had elected to include the soil aggregate in its LIFO inventory. Id. at 1079-1080. Petitioner has the burden of proof on this issue. Rule 142(a).

There is some language in Richardson I which suggests that Investments defined its inventory units by model code. Richardson Invs., Inc. v. Commissioner, 76 T.C. at 739. However, as discussed more fully infra p. 36, this finding was not material to the decision in that case. Furthermore, Investments' comptroller and Investments' C.P.A. both testified that

Investments never defined its inventory units for its new car pool by model code. The weight of the evidence in this case suggests that Investments never defnied its inventory units for its new car pool by model code, and we so find.

2. Unauthorized Change in Taxable Year 1981

Respondent determined that Investments made an unauthorized change in the treatment of a material item when it changed the definition of its inventory units for its new car pool from body size to model line in taxable year 1981. Petitioner asserts that Investments' change in definition of its inventory units was not a change in the treatment of a material item used in its dollar-value LIFO method of inventory accounting.[13]

Petitioner initially argues that Investments did not change the treatment of an item. Essentially, petitioner argues that the definition of the units used to compute beginning of the year value of ending inventory did not serve to define its items of inventory for dollar-value LIFO purposes. Respondent disagrees.

Under the dual-index, link-chain method, beginning of the year value of ending inventory serves as the denominator in both the annual deflator index computation and the layer-valuation

---

[13] Petitioner does not argue that Investments could change its method of accounting without respondent's consent, as did the taxpayers in Foley v. Commissioner, 56 T.C. 765 (1971) and Silver Queen Motel v. Commissioner, 55 T.C. 1101 (1971). In any event, we would find these cases distinguishable, as Investments regularly used a body size definition of item prior to 1981. Cf. Foley v. Commissioner, supra at 769-770; Silver Queen Motel v. Commissioner, supra at 1105; Convergent Technologies, Inc. v. Commissioner, T.C. Memo. 1995-320.

index computation.  The annual deflator index and the layer-valuation index are indexes of price change between the prior year and the current year; therefore, the denominator of each index, computationally, represents the aggregate of all items in ending inventory at beginning of the year value.  When Investments defined the units used to compute beginning of the year value of ending inventory, it was in substance defining its items of inventory.  Thus, when Investments changed the definition of its inventory units from body size to model line, it changed its definition of an item of inventory for purposes of section 1.446-1(e)(2)(ii)(a) and (c), Income Tax Regs.

Petitioner next argues that, even if the units used in the computation are "items" for section 446 purposes, the change from body size to model line was not a change in item for section 446(e) purposes, as such change was a permissible refinement or delineation of Investments' existing item definition.

We have previously determined that new or separate items may be created or arise in a taxpayer's dollar-value LIFO pool. Hamilton Indus., Inc. & Sub. v. Commissioner, 97 T.C. 120 (1991); Amity Leather Prods. Co. v. Commissioner, 82 T.C. 726 (1984); Wendle Ford Sales, Inc. v. Commissioner, 72 T.C. at 452.[14]  More

---

[14]  These cases dealt with the double-extension method of valuing the base-year cost of ending inventory.  However, since the double extension method and the link-chain method are both concerned with valuing the taxpayer's items in a pool, sec. 1.472-8(a), Income Tax Regs., the analysis in these cases is relevant in the case at bar, even though Investments utilized the link-chain method of pricing its items of inventory.

specifically, we have found that, if goods or products have substantially dissimilar characteristics, whether in terms of their physical nature, Wendle Ford Sales, Inc. v. Commissioner, supra at 459, or whether in terms of cost, Amity Leather Prods. Co. v. Commissioner, supra at 739-740, these goods or products are properly treated as new or separate items. Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 136-137.[15] Furthermore, a reconstruction of base-year cost for a new or separate item will not be treated as a change in method of accounting under section 446(e). See Amity Leather Prods. Co. v. Commissioner, supra at 739-740; see also sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.

In analyzing whether a new or separate item was created or arose in taxable year 1981, we note that petitioner does not allege that the physical character or cost of Investments' new car inventory substantially changed between taxable years 1980 and 1981. Furthermore, the record does not indicate that such a change occurred. Rather, it appears that Investments changed its definition of its items of inventory without the predicate change in facts required by the previously noted exception for the creation of a new or separate item. Accordingly, we hold that Investments' change in definition of its items of inventory was not due to the creation of a new or separate item. Amity Leather

---

[15] To determine whether a new or separate item exists, we examine the facts and circumstances of the case. Wendle Ford Sales, Inc. v. Commissioner, 72 T.C. 447, 459 (1979).

Prods. Co. v. Commissioner, supra at 739-740; Wendle Ford Sales, Inc. v. Commissioner, supra at 459.

Petitioner next argues that, even if a change in the treatment of an item is found to have occurred in taxable year 1981, the change does not rise to the level of a change in method of accounting because such change was merely a change in valuation. In support of this argument, petitioner relies on the regulatory exception for a change in underlying facts, section 1.446-1(e)(2)(ii)(b), Income Tax Regs, and the case of Baltimore & O.R.R. v. United States, 221 Ct. Cl. 16, 603 F.2d 165 (1979). In Baltimore & O.R.R., the court found that the taxpayer had not changed its method of accounting by changing to a valuation formula that more accurately estimated salvage value, finding that such a change was merely a change in underlying fact. Id. at 168-169.

The objective of inventory accounting is to value inventories. All-Steel Equip. Inc. v. Commissioner, 54 T.C. 1749, 1757 (1970), affd. in part and revd. in part 467 F.2d 1184 (7th Cir. 1972); see Fox Chevrolet, Inc. v. Commissioner, 76 T.C. at 722. Accordingly, any change in inventory accounting can be characterized as a change in valuation. Thus, under petitioner's argument, any change in inventory accounting could be characterized as a change in underlying fact and, therefore, not a change in method of accounting. We reject petitioner's

argument, as it is plainly at odds with section 446(e) and section 1.446-1(e)(2)(ii)(c), Income Tax Regs. Furthermore, the case of Baltimore & O.R.R.. v. United States, supra, is inapposite herein, because, unlike the case at bar, that case did not involve an inventory accounting issue. Pacific Enters. & Subs. v. Commissioner, 101 T.C. 1, 21 (1993).

Having found that Investments changed the treatment of an item of inventory and that the change did not meet the exception for a new or separate item, we now must examine whether the item changed was "material". The regulations define "material item" as "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. In accord with the regulatory definition of material item, we have previously found that the essential characteristic of a material item is that it determines the timing of income or deductions. Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 126; Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989); Primo Pants Co. v. Commissioner, 78 T.C. at 722.[16] Thus, we have held that a change in the method of determining both beginning and ending inventory

---

[16] Although these cases deal with a change in method of accounting for purposes of sec. 481, they are relevant to our analysis herein because sec. 481 defers to sec. 446(e) for the definition of change in method of accounting. Pacific Enters. & Subs. v. Commissioner, 101 T.C. 1, 21 (1993); Primo Pants Co. v. Commissioner, 78 T.C. 705, 721 (1982); sec. 1.481-1(a)(1), Income Tax Regs.

is a change in the treatment of a material item and, therefore, constitutes a change in method of accounting.  Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 126; Wayne Bolt & Nut Co. v. Commissioner, supra at 511.

Investments changed its definition of its items of inventory for its new car pool from body size to model line in taxable year 1981.  This change caused Investments' annual and cumulative indexes to be lower than they would have been had Investments continued using a body size definition of item.  For example, the taxable year 1980 cumulative deflator index for the new car pool under a body size definition of item would be 2.090204, while the cumulative deflator index under a model line definition would be 1.970891.  Investments' taxable year 1980 yearend new car inventory at actual cost was $1,437,854.95.  Accordingly, under a body size definition of item, Investments' taxable year 1980 ending inventory for new cars at base-year cost would be $687,889.88; in contrast, under a model line definition of item, its ending inventory at base-year cost would be $729,545.65 (1,437,854.95/2.090204 and 1,437,854.95/1.970891, respectively).

Since the annual and cumulative indexes would be lower under the model line definition of item, Investments' ending inventory at base-year cost would be higher.  Although a higher base-year cost of ending inventory will generally produce higher taxable income, i.e., COGS will be lower, taxpayers may, nevertheless, desire a higher base-year cost of ending inventory in a given

year to avoid liquidating a LIFO layer, causing a match of historical costs against current revenues.  Thus, depending on a taxpayer's particular set of facts and circumstances, it may be advantageous to have a lower annual deflator index.

When Investments changed its definition of its items of inventory, which resulted in lower annual and cumulative indexes and, therefore, affected the computation of beginning and ending inventory, the change was a change in the treatment of a material item.  Hamilton Indus., Inc. & Sub. v. Commissioner, 97 T.C. at 126; Wayne Bolt & Nut Co. v. Commissioner, supra at 510; Primo Pants Co. v. Commissioner, supra at 722.  After changing its definition of items for its new car pool from body size to model line in taxable year 1981, Investments did not file a Form 3115, Application for Change in Accounting Method, or otherwise request respondent's consent to change its LIFO inventory valuation method.[17]  Therefore, we hold that Investments changed its method of accounting without respondent's consent.[18]

---

[17]    The purpose of the sec. 446(e) consent requirement is to enable the Commissioner to prevent distortions of income that often accompany changes in accounting methods by withholding her consent until the taxpayer agrees to adjustments that will prevent duplications or omissions of items of income and expense. Advertisers Exch., Inc. v. Commissioner, 25 T.C. 1086, 1093 (1956), affd. 240 F.2d 958 (2d Cir. 1957); see sec. 481(a).

[18]    Respondent also determined that Investments changed its method of accounting when it changed the definition of its items of inventory for its new truck pool.  At trial and on brief, petitioner argued that the change from body size to model line in Investments' new car pool was not a change in method of accounting.  However, petitioner did not specifically address the change in method of accounting issue with respect to Investments'
(continued...)

C. <u>Review of Determinations Made Under Section 446(b)</u>

1. <u>Clear Reflection</u>

Even though a taxpayer is restricted from changing its method of accounting without the Commissioner's consent, the Commissioner <u>can</u> change the taxpayer's method when the existing method does not clearly reflect income. Sec. 446(b). Respondent determined that Investments' method of accounting for its new car and new truck inventories did not clearly reflect income. Petitioner asserts that Investments' method of accounting for its new car and new truck inventories did clearly reflect income.

Inventory accounting is governed by sections 446 and 471. <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 531 (1979). Sections 446 and 471 vest the Commissioner with wide discretion in matters of inventory accounting and give her wide latitude to adjust a taxpayer's method of accounting for inventory so as to clearly reflect income. <u>Id.</u> at 532; <u>Hamilton Indus., Inc. & Sub. v. Commissioner</u>, <u>supra</u> at 128. Accordingly, the Commissioner's determination with respect to clear reflection of income is entitled to more than the usual presumption of correctness, and the taxpayer bears a heavy burden of overcoming a determination that a method of accounting does not clearly reflect income. <u>Hamilton Indus, Inc. & Sub. v. Commissioner</u>, <u>supra</u> at 128; <u>Rotolo v. Commissioner</u>, 88 T.C. 1500, 1513-1514 (1987). However, if a

---

[18](...continued)
new truck pool; accordingly, we find that petitioner conceded this issue.

taxpayer establishes that a method of accounting clearly reflects income, the Commissioner may not disturb the taxpayer's choice. Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995); RLC Indus. Co. v. Commissioner, 98 T.C. 457, 491 (1992), affd. 58 F.3d 413 (9th Cir. 1995). Whether a taxpayer's method of accounting clearly reflects income is a question of fact, and the issue must be decided on a case-by-case basis. Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371; RLC Indus. Co. v. Commissioner, supra at 492; Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 128.

Section 446(a) requires a taxpayer to compute taxable income under the method of accounting it regularly uses in keeping its books. Section 446(b), however, provides:

> If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

The Commissioner's authority under section 446(b) reaches not only overall methods of accounting but also a taxpayer's method of accounting for specific items of income and expense. Ford Motor Co. v. Commissioner, 102 T.C. 87, 100 (1994), affd. 71 F.3d 209 (6th Cir. 1995); Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989); sec. 1.446-1(a), Income Tax Regs.

In regard to inventory accounting, the regulations establish two distinct tests to which an inventory must conform:

(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

(2) It must clearly reflect the income. [Sec. 1.471-2(a), Income Tax Regs.]

Furthermore, the regulations provide that, in order to clearly reflect income:

the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation * * * [Sec. 1.471-2(b), Income Tax Regs.]

In addition, the regulations addressing dollar-value LIFO provide:

Any taxpayer may elect to determine the cost of his LIFO inventories under the so-called "dollar-value" LIFO method, provided such method is used consistently and clearly reflects the income of the taxpayer * * * [Sec. 1.472-8(a), Income Tax Regs.]

The foregoing regulations unequivocally indicate that consistent application of a method of accounting is necessary for the method to clearly reflect income. Sec. 446(b); secs. 1.471-2(b), 1.472-8(a), Income Tax Regs. Accordingly, if a method of inventory accounting is not consistently applied, this fact alone may cause the method not to clearly reflect income. Our case law has also recognized the significance of the consistency requirement when examining whether a method of accounting clearly reflects income. Fort Howard Paper Co. v. Commissioner, 49 T.C. 275, 284 (1967); Photo-Sonics, Inc. v. Commissioner, 42 T.C. 926, 935 (1964), affd. 357 F.2d 656 (9th Cir. 1966); Klein Chocolate Co. v. Commissioner, 36 T.C. 142, 146 (1961), supplementing 32

T.C. 437 (1959); Advertisers Exch., Inc. v. Commissioner, 25 T.C. 1086, 1092 (1956), affd. 240 F.2d 958 (2d Cir. 1957).

Investments defined its items of inventory for its new car pool by body size for taxable years 1974 through 1980. Despite this general body size definition of item, Investments treated the Escort model line as a separate item for taxable year 1980. This treatment of the Escort model line was inconsistent with its method of defining its items of inventory. Subsequently, in taxable year 1981, Investments began defining its items of inventory for its new car pool by model line. This definition of its items of inventory for its new car pool was inconsistent with its existing method of defining its items of inventory. In its new truck pool, Investments variously defined its items of inventory by body type (i.e., all vans as one item), load carrying ability, body size, and model line. Each change in the definition of its items of inventory for its new truck pool represented an inconsistent application of its method of defining its items of inventory.

Investments' inconsistent definition of its items of inventory for both its new car and new truck LIFO pools strikes at the heart of the requirement that a taxpayer's inventory accounting must clearly reflect income. Investments' inconsistent definition of its items of inventory violates the clear reflection rules of the Code, sec. 446(b), the regulations, secs. 1.471-2(b) and 1.472-8(a), Income Tax Regs., and our case

law, e.g., <u>Fort Howard Paper Co. v. Commissioner</u>, <u>supra</u> at 284.
Investments' inventory practice was inconsistent from year to
year, and therefore its method of inventory accounting does not
clearly reflect income.[19]

2. <u>Abuse of Discretion</u>

Respondent determined that Investments should define its
items of inventory for both its new car and new truck pools by
model code.  Petitioner asserts that such a determination was an
abuse of discretion.

Once the Commissioner determines that a taxpayer's method
does not clearly reflect income, she may select for the taxpayer
a method which, in her opinion, does clearly reflect income.
Sec. 446(b); <u>Hamilton Indus., Inc. & Sub. v. Commissioner</u>, 97
T.C. at 129.  The taxpayer has the burden of showing that the
method selected by the Commissioner is incorrect, and that burden
is extremely difficult to carry.  <u>Photo-Sonics, Inc. v.
Commissioner</u>, <u>supra</u> at 933.  Accordingly, the Commissioner's
determination will not be set aside unless shown to be clearly
unlawful or plainly arbitrary.  <u>Thor Power Tool Co. v.
Commissioner</u>, 439 U.S. at 532; <u>Hamilton Indus., Inc. & Sub. v.
Commissioner</u>, <u>supra</u> at 129;  <u>Richardson Invs., Inc. v.
Commissioner</u>, 76 T.C. at 745.

---

[19]    Respondent made alternative arguments as to why Investments'
method of defining its items of inventory did not clearly reflect
income.  Having disposed of the clear reflection issue, we need
not address these alternative arguments.

The Code and the regulations do not define the term "item". Amity Leather Prods. Co. v. Commissioner, 82 T.C. at 739-740; Wendle Ford Sales, Inc. v. Commissioner, 72 T.C. at 455. However, we have previously addressed the definition of the term for purposes of the dollar-value LIFO method. See Hamilton Indus., Inc. & Sub. v. Commissioner, supra; Amity Leather Prods. Co. v. Commissioner, supra; Wendle Ford Sales, Inc. v. Commissioner, supra.[20]

In our prior cases, we have found that the proper definition of an item for dollar-value LIFO purposes depends on the specific facts and circumstances of the case. Wendle Ford Sales, Inc. v. Commissioner, supra at 459, 461. Furthermore, we have found that we must examine the facts and circumstances of the case in light of the objectives of the dollar-value LIFO method. See Hamilton Indus., Inc. & Sub. v. Commissioner, supra at 135-136; Amity Leather Prods. Co. v. Commissioner, supra at 733-734; Wendle Ford Sales, Inc. v. Commissioner, supra at 458-459.

A major objective of the LIFO method is to eliminate from earnings any artificial profits resulting from inflationary increases in inventory costs. Amity Leather Prods. Co. v. Commissioner, supra at 732. Consequently, the dollar-value method is designed to ensure that any increase in the cost of property passing through the inventory during the year is reflected in the cost of goods sold. Hamilton Indus., Inc. &

---

[20] See supra note 14.

Sub. v. Commissioner, supra at 132.  To properly reflect increases attributable to inflation, we have noted that the goods contained in a taxpayer's item categories must have similar characteristics, because a "system which groups like goods together and separates dissimilar goods permits cost increases attributable to inflation to be isolated and accurately measured."  Id. (fn. ref. omitted).  Therefore, we have found that a "narrower definition of an item within a pool will generally lead to a more accurate measure of inflation (i.e., price index) and thereby lead to a clearer reflection of income." Amity Leather Prods. Co. v. Commissioner, supra at 734.

We have articulated another objective of dollar-value LIFO and a related consideration in determining the proper definition of an item.  We have noted that the dollar-value LIFO method does not require the matching of specific goods in opening and closing inventories, but focuses on the total dollars invested in inventory.  Wendle Ford Sales, Inc. v. Commissioner, supra at 458.  Accordingly, minor modifications to an item should not cause the item to be treated as new or separate.  Id. at 459. "This freedom from having to take into account minor technological changes in a product represents a major objective of the dollar-value approach."  Id. at 458.  Thus, we have cautioned that the definition of an item of inventory must not be so narrow as to impose unreasonable administrative burdens upon a taxpayer, thus rendering impractical the taxpayer's use of the

dollar-value LIFO method of inventory valuation.  Amity Leather
Prods. Co. v. Commissioner, supra at 734.

Petitioner asserts that in Richardson I we rejected the
Commissioner's determination that Investments should define its
items by model line.  Accordingly, petitioner argues that
respondent's determination in this case is an abuse of
discretion, as he argues that we have already rejected a model
line definition of item, which is less restrictive than a model
code definition of item.

We disagree with petitioner's reading of Richardson I.  In
Richardson Invs., Inc. v. Commissioner, 76 T.C. 736 (1981), the
primary issue was whether Investments "properly adopted the use
of a single LIFO inventory pool in computing inventory values
pursuant to the dollar-value, link-chain LIFO method".  Id. at
737.  Respondent's alternative argument in Richardson I was that
Investments "must compute a separate yearly index for each item
of a pool, which indexes will, in aggregate, represent the yearly
index for the pool."  Id. at 749.  Rejecting this argument, the
Court found that "as long as petitioner selects a representative
portion of the inventory in a particular pool to compute an index
for the pool under the link-chain method, the computation will be
valid."  Id.  Thus, we did not address the proper scope of an
item, i.e., whether items of inventory should be defined by model
line; rather, we merely indicated that the taxpayer could use a

combination of the link-chain method and the index method to price its LIFO inventories.[21]

Petitioner next argues that respondent's proposed definition of item is so narrow as to effectively require Investments to use the specific goods LIFO method. We disagree with petitioner's assertion. Requiring Investments to use a model code definition of item is not tantamount to placing Investments on the specific goods method of LIFO, as the model code definition of an item does not require Investments to match specific goods in opening and closing inventory. Simply put, even though the definition of an item is narrower, Investments is still free to use the dollar-value LIFO method.

Finally, petitioner argues that the model code definition of an item is too narrow, and that respondent abused her discretion by requiring Investments to use that definition. Petitioner does not specify why the model code definition of an item is too narrow, and we have previously found that a narrower definition of an item more clearly reflects income. Amity Leather Prods. Co. v. Commissioner, supra at 734. Furthermore, since petitioner has stipulated that Investments has all of the data necessary to implement a model code definition of an item, petitioner cannot

---

[21] We note that, in this case, the parties have stipulated that Investments has never double extended a representative portion of its new car and new truck inventory, but has always double extended its entire inventory.

argue that the model code definition would be administratively burdensome to implement.

Based on the foregoing, petitioner has failed to demonstrate that the method selected by respondent was clearly unlawful or plainly arbitrary; therefore, we hold that respondent's determination must be upheld, and Investments must utilize a model code definition of an item.[22]  Thor Power Tool Co. v. Commissioner, 439 U.S. at 532; Hamilton Indus. v. Commissioner, 97 T.C. at 129.

Airplane Expenses

Respondent disallowed the deductions arising from Investments' operation of the airplane to the extent that such deductions exceeded the airplane rental fees it received. Respondent based her determination on alternative arguments; specifically, respondent argued that the excess expenses were (1) incurred primarily for the benefit of petitioner, (2) not ordinary and necessary, or (3) unreasonable in amount. Petitioner asserts that the excess expenditures are allowable.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to the

---

[22]   Respondent's determination effects a change in Investments' method of accounting; accordingly, respondent may make a sec. 481 adjustment.  Weiss v. Commissioner, 395 F.2d 500, 502 (10th Cir. 1968) (sec. 481 adjustment applies to subch. S shareholders), affg. T.C. Memo. 1967-125; Hamilton Indus., Inc. & Sub. v. Commissioner, 97 T.C. 120, 127-128 (1991).  The parties may include this adjustment in their Rule 155 computations.

deductions claimed. Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

Section 162(a) allows a taxpayer to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. If a corporation owns and maintains property primarily for the benefit of a shareholder, the deductions arising from such property will not be allowable, as such deductions are not incurred in carrying on a trade or business. <u>International Trading Co. v. Commissioner</u>, 275 F.2d 578, 584, 585 (7th Cir. 1960), affg. T.C. Memo. 1958-104; <u>Cirelli v. Commissioner</u>, 82 T.C. 335, 350 (1984); <u>International Artists, Ltd. v. Commissioner</u>, 55 T.C. 94, 104 (1970); <u>Challenge Manufacturing Co. v. Commissioner</u>, 37 T.C. 650, 659-661 (1962); see <u>A.E. Staley Manufacturing Co. v. Commissioner</u>, 105 T.C. 166, 191 (1995). In contrast,

> where the acquisition and maintenance of property such as an automobile or residence is primarily associated with profit-motivated purposes, and personal use can be said to be distinctly secondary and incidental, a deduction for maintenance expenses and depreciation will be permitted. [<u>International Artists, Ltd. v. Commissioner</u>, <u>supra</u> at 104.]

Furthermore, if substantial business and personal motives exist, allocation of the expenditures becomes necessary. <u>Id.</u> at 105; see also <u>International Trading Co. v. Commissioner</u>, <u>supra</u> at 587; <u>Gibson Prods. Co. v. Commissioner</u>, 8 T.C. 654, 660 (1947).

In addition to the requirement that deductions be incurred in the conduct of a trade or business, section 162(a) provides

that a deduction will be allowable only if it is "ordinary and necessary". An "ordinary" expense is one that is normal or common in the particular trade or business. <u>Palo Alto Town & Country Village, Inc. v. Commissioner</u>, 565 F.2d 1388, 1390 (9th Cir. 1977), remanding T.C. Memo. 1973-223; <u>Noyce v. Commissioner</u>, 97 T.C. 670, 685 (1991). "An expense is necessary if it is appropriate and helpful in carrying on the trade or business." <u>Noyce v. Commissioner</u>, <u>supra</u> at 685; see also <u>Palo Alto Town & Country Village, Inc. v. Commissioner</u>, <u>supra</u> at 1390. Finally, for an expense to be considered ordinary and necessary, it must also be reasonable in amount in relation to its purpose. <u>Noyce v. Commissioner</u>, <u>supra</u> at 687; <u>Sherman v. Commissioner</u>, T.C. Memo. 1982-582; <u>Harbor Medical Corp. v. Commissioner</u>, T.C. Memo. 1979-291, affd. without published opinion 676 F.2d 710 (9th Cir. 1982). We examine the facts and circumstances of the particular case to determine whether an expense is ordinary and necessary. <u>Palo Alto Town & Country Village, Inc. v. Commissioner</u>, <u>supra</u> at 1390; <u>Noyce v. Commissioner</u>, <u>supra</u> at 686-688.

Respondent first argues that the airplane expenditures were incurred primarily for the personal benefit of petitioner. Respondent does not premise this argument on petitioner's concededly personal use of the airplane, which accounted for 3 percent and 9 percent of the total use of the airplane for 1988 and 1989, as petitioner paid the actual cost associated with such

secondary and incidental use of the airplane.  Rather, respondent focuses on petitioner's relationship with the other entities and the use of the airplane in providing management services to those entities.

During the taxable years at issue, the airplane was used to transport Investments' employees to six of the other entities so that the employees could provide management services.  Since petitioner had an ownership interest in five of these six entities, respondent argues that the airplane was used primarily to benefit petitioner as an owner of these entities, not to benefit Investments.  Basically, respondent argues that the airplane was used to improve the value of the other entities by making Investments' employees available for management consultations.  It is true that the airplane facilitated the availability of Investments' employees to the other entities.  Accordingly, assuming the management services were beneficial to the other entities, it is true that the expenses of the airplane benefited petitioner, since he had an ownership interest in all but one of the other entities serviced during the taxable years at issue.  Nonetheless, we find this was an incidental benefit of the acquisition and maintenance of the airplane.

We find that Investments owned and maintained the airplane primarily for the benefit of its business-related activities, including its management services activity and its Rich Ford Sales activity.  Investments charged substantial fees for its

management services during the years at issue; in addition, when the airplane was used in the conduct of the management services activity, Investments received reimbursements for some of the actual costs associated with the maintenance of the airplane. Overall, 56 percent and 77 percent of the airplane's total flight time during taxable years 1988 and 1989, respectively, was associated with providing management services. In addition, 11 percent of the airplane's total flight time for taxable year 1988 was for the benefit of Rich Ford Sales. In contrast to this substantial business-related use, petitioner's actual use of the airplane was minor, and he paid for such use. Accordingly, we reject respondent's argument that the airplane was maintained primarily for the benefit of petitioner, and we hold that the airplane was owned and maintained primarily for the benefit of Investments' business activities.

Respondent next argues that the airplane expenditures were not allowable because they were not ordinary and necessary. Each of the other entities was a substantial distance from Albuquerque, New Mexico. By maintaining an airplane, Investments could provide the other entities with management, accounting, and legal support within a short time period. In addition, the airplane enabled Investments' employees to visit more than one of the other entities in a single day, and it allowed the employees to visit one of the other entities for part of the day and return to Investments' home office for the remainder of the day. Based

on the location of the other entities, the service provided the other entities, and Investments' conduct of a management consulting service, we find that Investments' maintenance of an airplane was an ordinary expense. See <u>Palo Alto Town & Country Village, Inc. v. Commissioner</u>, <u>supra</u> at 1390; <u>Harbor Medical Corp. v. Commissioner</u>, T.C. Memo. 1979-291. Next, we must examine whether the expense of maintaining the airplane was necessary.

The airplane was used by Investments in the conduct of both Rich Ford Sales and in the provision of management services. Use of the airplane in either activity produced time and cost savings. The airplane produced time savings in that it allowed Investments' employees to travel when necessary, not when commercial flights were available; furthermore, the airplane allowed Investments' employees to visit more than one location in a single day, which often could not be accomplished on a commercial schedule. The airplane also saved other travel expenses, as traveling in 1 day, instead of 2 or more days as would be required via commercial airlines, saved room and board expenditures. The airplane also allowed Investments to quickly respond to emergency situations arising in either the Rich Ford Sales business or in the management services activity. Based on the foregoing facts and circumstances, we find that the ownership and maintenance of the airplane were both appropriate and helpful

to Investments; accordingly, we find the expenditures arising from the ownership and maintenance of the plane were necessary.

Finally, respondent argues that the airplane expenditures were unreasonable in amount compared to the objectives to be accomplished. Investments' total costs of owning, operating, and maintaining its airplane, exclusive of pilot salary, during 1988 and 1989 were $218,452.14 and $142,427.85, respectively. However, as noted above, we have found that the airplane was both an ordinary and necessary expense of the operation of Investments' Rich Ford Sales division and the operation of its management services activity. The latter activity alone generated management fees of $814,452 and $970,997 for taxable years 1988 and 1989, respectively. In addition, Investments received reimbursements for airplane expenditures of $48,048.50 and $37,674, exclusive of meals, lodging, etc., for 1988 and 1989, respectively. Although the airplane expenditures were large for the taxable years at issue, use of the airplane was an ordinary and necessary part of Investments' businesses and generated substantial income during the years at issue. Accordingly, we find that the expenditures associated with owning and maintaining the airplane for the years at issue were reasonable.

To reflect the foregoing,

Decision will be entered

under Rule 155.